GENERAL SIGNAL CORPORATION AND SUBSIDIARIES,
PETITIONER *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 20064–92.         Filed August 22, 1994.

*Russell E. Greenblatt, Rex A. Guest,* and *David K. Schmitt,* for petitioner.

*Victoria Wilson Fernandez, Randall P. Andreozzi, Andrew W. Stumpff,* and *Michael Roach,* for respondent.

NIMS, *Judge:* Respondent determined deficiencies in Federal income tax with respect to petitioner's 1986 and 1987 taxable years in the amounts of $15,388,891 and $6,787,120, respectively.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All

Rule references are to the Tax Court Rules of Practice and Procedure.

Following concessions by the parties, the sole issue to be decided in this opinion is whether and to what extent, if any, contributions made by petitioner to a welfare benefit trust during 1986 and 1987 are deductible pursuant to sections 419 and 419A. By order, an issue relating to petitioner's entitlement to a net operating loss deduction for its taxable year ended December 31, 1987, has been severed and will be decided subsequently.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Petitioner is a New York corporation having its principal place of business at Stamford, Connecticut. It is an accrual basis taxpayer and files its Federal income tax returns on a calendar year basis.

Petitioner produces instrumentation and controls and related systems and equipment for semiconductor production, telecommunications transmission, test and measurement, industrial automation, management of electrical energy, and transportation. Petitioner is the common parent of an affiliated group of corporations filing consolidated Federal corporation income tax returns. Petitioner had approximately 40 domestic subsidiaries and 49 foreign subsidiaries during its 1986 and 1987 taxable years. Petitioner's common stock is publicly traded on the New York Stock Exchange.

*Events Preceding Formation of the Voluntary Employees' Beneficiary Association (VEBA)*

Robert M. Dolgin formed Dolgin & Associates in 1984 as a tax and benefits consulting business. Beginning in July 1985, Dolgin & Associates attempted to interest petitioner's tax department in a recommendation aimed at creating a significant tax deferral and, if an expected decrease in corporate tax rates occurred, permanent tax savings.

In December of 1985, Dolgin & Associates presented its "Proposal To General Signal Corporation For VEBA Contributions" (the 1985 proposal). The 1985 proposal recommended

that petitioner form a voluntary employees' beneficiary association (VEBA) for the purpose of funding employee benefits "in a unique manner which will result in a significant tax reduction in the current year." The 1985 proposal stated, in part, as follows:

> We recommend that General Signal contribute an amount to a VEBA to create a reserve at the Company's year-end for benefit payments to be made next year. An employer can deduct a contribution to a VEBA prior to January 1, 1986 if the contribution is reasonable in amount. The contribution can cover current year claims for benefits as well as a reserve for benefits to be incurred in the succeeding year. We also recommend that the Company adopt a trust year-end preceding the Company's year-end so that the Company might obtain a deferral which will be permanent as long as the VEBA is prefunded in future years. * * *

> The Tax Reform Act of 1984 eliminates the reserve for benefits to be incurred in succeeding years for contributions made after December 31, 1985 for taxable years ending after this date. These provisions of the Act do not apply for the year ending December 31, 1985. * * * Most of the tax savings from the contribution can be derived immediately by reducing the Company's estimated tax payment for the quarter in which the plan is implemented.

> Income tax deferrals could be particularly beneficial if federal income tax rates are lowered as presently proposed. * * *

The 1985 proposal included a discussion of the rules applicable to funding VEBA's prior to and after the effective date of sections 419 and 419A, as enacted by the Deficit Reduction Act of 1984, Pub. L. 98–369, section 511(a), 98 Stat. 494, 854. The 1985 proposal also discussed the unrelated business income tax provisions contained in section 512(a)(3) as applicable to VEBA's under the Deficit Reduction Act of 1984.

The 1985 proposal suggested that, under general tax principles, the deduction of advanced funding in 1985 would be allowed if the funding did not create a benefit with a useful life of more than 1 year. The 1985 proposal advised that in years after 1985, funds equal to the amounts expended by the trust created in connection with the VEBA (see *infra* p. 219) during its taxable year could be contributed on a deductible basis at petitioner's yearend pursuant to section 419.

The 1985 proposal recommended adopting a trust taxable year ending November 30 so that the trust could be prefunded in December; i.e., the last month of petitioner's

taxable year and the first month of the trust's taxable year. This method of funding was believed by Dolgin & Associates to allow prefunding of benefits while avoiding application of the unrelated business income tax at the trust's yearend.

In advance of the presentation of the 1985 proposal, petitioner had agreed to pay Dolgin & Associates a contingent fee if the proposal was successfully utilized by petitioner. Petitioner paid fees to Dolgin & Associates for 1985, 1986, and 1987 with respect to the VEBA arrangement.

*Formation of the VEBA*

On December 20, 1985, petitioner's Corporate Pension Board (the pension board) received a recommendation that it establish a VEBA and that it "contribute $30,000,000 to the VEBA to create a reserve at year-end for the health and short term disability payments to be paid next year." The recommendation also stated that

The trust should have a year-end preceding the Corporation's year-end so that the Corporation may obtain a deferral which will be permanent as long as the VEBA is prefunded in future years. Therefore, we will use November 30th as the year-end for the trust.

On the same day, pursuant to the above recommendation, the pension board resolved to establish the General Signal Corp. Employees' Welfare Benefit Trust (the VEBA trust) as the funding medium for certain employee welfare benefit plans. The pension board also resolved to contribute $30 million to the VEBA trust by December 31, 1985.

The VEBA trust agreement, in accordance with the resolution of the pension board, provided that: (1) The pension board would be the named plan manager, or fiduciary, (2) the Chase Manhattan Bank, N.A., would be appointed as the trustee and investment manager, and (3) a trust account would be established at the Chase Manhattan Bank, N.A. The VEBA trust agreement provided that its purpose was to provide participants with welfare benefits of a type specified in section 501(c)(9) and that the trust fund was to be exclusively used to provide benefits to participants, their dependents, and designated beneficiaries, and for reasonable administration expenses.

The VEBA trust agreement provided that petitioner would "establish and carry out a funding poli v onsistent with the

purpose of the Plan and the requirements of applicable law" and that, pursuant to such funding policy, petitioner would "contribute to the Trust such amount or amounts, if any, as the Company may determine." The trust agreement directed the trustee

To make payments from the Trust Fund to such persons, in such manner, at such times and in such amounts as the Plan Manager shall direct without inquiring as to whether a payee is entitled to the payment or as to whether a payment is proper, to the extent such payment is made in good faith without actual notice or knowledge of the impropriety of such payment. * * *

The VEBA trust agreement provided that all assets of the trust were to be administered as a commingled fund and that no participant, dependent, or beneficiary was to have any legal or equitable right arising from the creation of the VEBA trust or any direct interest in any specific asset of the VEBA trust. The trust agreement also provided in section 9.6, entitled "No Guarantee", that

Nothing contained in the Plan and Trust shall constitute a guarantee by the Company, Plan Manager or Trustee that the assets of the Trust Fund will be sufficient to pay any benefit to any person; benefits under the Plan are limited to the assets remaining in the Trust at the time payment is made. * * *

The trust agreement reserved to petitioner the right to permanently discontinue contributions at any time or, subject to restrictions on the use of assets already in the trust, to terminate the VEBA trust.

The VEBA trust adopted the cash method of accounting and a fiscal year ending on November 30.

During the years in issue, petitioner had approximately 40 operating units, many of which had their own employee welfare benefit plans. A total of 113 of these plans was included in the VEBA trust. During the years in issue, approximately 16,000 to 18,000 employees and 4,000 retirees were covered by the welfare, medical, and life insurance plans of petitioner. The VEBA trust was the funding vehicle for approximately 90 percent of petitioner's total costs of providing medical and life insurance benefits.

Prior to establishing the VEBA trust, petitioner's employee welfare benefits had been paid by its individual units. Following the formation of the VEBA trust, each insurance com-

pany, HMO, and Blue Cross organization which provided welfare benefits to petitioner's employees was instructed that it would be paid by the VEBA trust and that the name on each contract was to be changed from that of the individual unit covered to that of the VEBA trust. Thereafter, petitioner's units were required to send check request forms to the Chase Manhattan Bank, N.A., as trustee, whereupon the Chase Manhattan Bank, N.A., would process the request and send a check to the insurance company.

On December 30, 1985, petitioner contributed $30 million to the VEBA trust. Petitioner claimed a deduction for the full amount of its $30 million contribution on its Federal income tax return for its 1985 taxable year. Petitioner also claimed a deduction for the actual costs of providing employee medical and life insurance benefits during the 1985 taxable year.

*The 1986 Proposal*

On January 29, 1986, temporary regulations were issued under sections 419 and 419A. On February 6, 1986, Robert Dolgin sent a letter to Erwin Kantor, petitioner's vice president—taxes, providing him with a copy of the new regulations and stating in part as follows:

> The proposed regulations attempt to disallow deductions after 1985 for contributions after 1985 to the extent these contributions result in a fund balance in excess of the qualified asset account limit, even though the regulations recognize that IRC Section 419 would otherwise allow a deduction for qualified direct costs of the fund. Under the regulations, overlapping the year-ends of the trust and the company will not avoid the disallowance of the deduction.

In May 1986, Dolgin & Associates provided petitioner with a new proposal entitled "Proposal To General Signal Corporation For Prefunding Employee Benefits" (the 1986 proposal). With respect to the new temporary regulations, the 1986 proposal states:

> The newly issued regulations deny a deduction for an amount contributed to a VEBA equal to the qualified direct cost (i.e. the total payments during the year) of the fund to the extent the total amount in the fund at year-end exceeds the account limit of the fund at the fund's year-end, even though IRC Section 419 would allow such a deduction. This is true even for amounts contributed to the fund after the fund's year-end but prior to the Company's year-end. * * * [Fn. ref. omitted.]

The 1986 proposal explained that sections 419 and 419A, subject to the new regulations, allowed deductible contributions to a VEBA in amounts equal to: (1) The VEBA's payment of current benefit claims during the taxable year, (2) prefunding for a reserve for incurred but unpaid claims for certain benefits, and (3) additions to "reserves * * * established for retired employees and to provide for future retirement medical benefits for active employees." The 1986 proposal recommended that petitioner fund both types of reserves and then stated that

Since the reserve allowed for post-retirement benefits should be substantially greater than the actual benefits paid out for retirees during a year, there should be sufficient funds in the VEBA to pay medical benefits incurred during a year for active employees. At each year-end, the Company can replenish the reserves for both incurred but unpaid claims and post-retirement benefits and maintain a permanent tax deferral.

The 1986 proposal also pointed out that income tax deferrals at that time would provide permanent tax savings if Federal income tax rates were lowered as then proposed. Under the heading "Economic Benefit", the 1986 proposal stated that

The Company will be prefunding the VEBA only for amounts that would have to be paid to employees during the next year regardless of whether a VEBA is established. By funding in advance, the Company obtains a permanent income tax deferral which could also result in a permanent tax savings if federal income tax rates are reduced. The tax benefits make prefunding economically attractive.

On August 27, 1986, petitioner received a letter from Dolgin & Associates requesting that the 1986 proposal be considered an extension of the 1985 proposal and that the same fee structure be applied. Petitioner thereafter continued to make payments to Dolgin & Associates.

*1986 VEBA Amendment and Contributions*

A memorandum dated October 21, 1986, drafted by Jack Bakelman, petitioner's director of taxes, discussed the need for petitioner to determine its liability for incurred but unpaid medical claims and "an estimate of the liabilities for existing retirees and a projected liability for these benefits for active employees". The memorandum then stated that

Determining this new liability for post retirement medical and life insurance benefits is very important now because it would help offset the $30 million turn around of the medical insurance funded in 1985. Also we might end up deducting the cost of these new expanded benefits (post retirement medical and life insurance benefits) in 1986 at a 46% rate vs. a 40% rate in 1987. * * *

On November 25, 1986, petitioner's director of taxes wrote a memorandum recommending that a contribution be made to the VEBA trust in the amount of $3,767,195 in order to bring the balance of the VEBA trust from its then balance of $2,037,515 to the amount for incurred but unpaid claims for medical benefits of $5,804,710. On November 26, 1986, this recommendation was approved by the pension board and a contribution of $3,767,195 was made to the VEBA trust.

On December 17, 1986, petitioner executed an amendment to the VEBA trust agreement (the first amendment), which amendment was executed by the trustee, the Chase Manhattan Bank, N.A., on January 22, 1987. The preamble to the first amendment stated, in part, that petitioner desired to use the VEBA trust to fund postretirement medical and life benefits "for so long as the Company wants to maintain such a funding policy". The first amendment amended section 3.2 of the VEBA trust agreement to provide, in part, as follows:

Section 3.2. Post-Retirement Medical and Life Benefits. The Company may contribute to the Trust for one or more Trust years an amount calculated in accordance with Sections 419 and 419A (including paragraph 419A(c)(2)) of the Code to fund benefits under the Plan. * * *

Also on December 17, 1986, the pension board resolved to contribute $35,300,000 to the VEBA trust.

Petitioner engaged the actuarial firm of Buck Consultants to determine the amount of tax-deductible contributions which it could make to the VEBA trust with respect to postretirement death and medical benefits. The conclusions of Buck Consultants were provided in a letter dated December 23, 1986, which computed the deduction limitations on three different bases. The basis relied upon by petitioner in deducting its 1986 VEBA contributions with respect to liability for postretirement death and medical benefits broke down the liability for each among: (1) Normal cost (i.e., the portion of the liability with respect to employees which is accrued in the valuation year), (2) previously accrued liability with

respect to employees, and (3) accrued liability with respect to retirees. The accrued liability with respect to employees was amortized over a period of 15 years, while the accrued liability with respect to retirees was amortized over 1 year.

Buck Consultants determined the amount of tax-deductible contributions which petitioner could make with respect to postretirement death and medical benefits for 1986 to be as follows:

|  | Death benefits | Medical benefits | Total | Percent |
|---|---|---|---|---|
| Normal cost | $351,815 | $1,057,021 | $1,408,836 | 4.0 |
| Accrued liability: |  |  |  |  |
| Active employees | 652,308 | 1,710,610 | 2,362,918 | 6.7 |
| Retirees | 8,892,721 | 22,637,914 | 31,530,635 | 89.3 |
|  | 9,896,844 | 25,405,545 | 35,302,389 |  |

Petitioner contributed $35,300,000 to the VEBA trust on December 29, 1986. Petitioner claimed a deduction for the full amount of the November and December 1986, contributions to the VEBA trust, totaling $39,067,195, on its Federal income tax return for its 1986 taxable year.

*Application for Exemption*

On January 16, 1987, the VEBA trust submitted a Form 1024, Application for Recognition of Exemption, to the Internal Revenue Service. In response to this application, on February 1, 1989, the Internal Revenue Service issued a favorable determination letter to the VEBA trust, ruling that the VEBA trust was a qualified tax-exempt entity under section 501(c)(9).

The application disclosed that medical and life insurance benefits were to be provided by the VEBA trust to both active and retired employees, and included a copy of the first amendment to the trust agreement. The projected budgets for the VEBA trust for its fiscal years ended in 1986, 1987, and 1988, which were included in the application, were as follows:

|  | 1986 | 1987 | 1988 |
|---|---|---|---|
| Anticipated contribution | $33,788,071 | $39,519,000 | $37,000,000 |
| Investment income | 1,084,333 | 1,264,000 | 1,184,000 |
| Total projected income | 34,872,404 | 40,783,000 | 38,184,000 |
| Anticipated expenses | 29,303,726 | 32,800,000 | 36,736,000 |
| Projected surplus | 5,568,678 | 7,983,000 | 1,448,000 |

## 1987 VEBA Contributions

On December 22, 1987, the pension board approved a resolution to contribute $40,204,000 to the VEBA trust on or before December 31, 1987. By letter dated December 28, 1987, Buck Consultants provided petitioner with its determination of the amount of tax-deductible contributions which petitioner could make to the VEBA trust with respect to post-retirement death and medical benefits for 1987. The worksheets related to this computation break down its components as follows:

|  | Death benefits | Medical benefits | Total | Percent |
|---|---|---|---|---|
| Normal cost | $751,223 | $2,294,277 | $3,045,500 | 7.6 |
| Accrued liability: |  |  |  |  |
| Active employees | 1,373,149 | 3,734,151 | 5,107,300 | 12.8 |
| Retirees | 8,984,450 | 22,844,187 | 31,828,637 | 79.6 |
|  | 11,108,822 | 28,872,615 | 39,981,437 |  |

Petitioner contributed $40,204,000 to the VEBA trust on December 29, 1987. Petitioner claimed a deduction for the full amount of this contribution on its Federal income tax return for its taxable year ended December 31, 1987.

## Petitioner's Financial Reporting of Retiree Benefits

The Financial Accounting Standards Board Statement No. 81 relating to "Disclosure of Postretirement Health Care and Life Insurance Benefits" (FASB 81) was in effect during the years here in issue. FASB 81 required that financial statements disclose, at a minimum, (1) a description of the benefits provided and the employee groups covered, (2) a description of accounting and funding policies, and (3) the cost of benefits recognized for the reporting period. FASB 81 included examples of appropriate disclosure statements, including the

following to be used where benefits are annually funded based on estimated accruals:

In addition to providing pension benefits, the company and its subsidiaries provide certain health care and life insurance benefits for retired employees. Substantially all of the company's employees, including employees in foreign countries, may become eligible for those benefits if they reach normal retirement age while working for the company. *The estimated cost of such benefits is accrued over the working lives of those employees expected to qualify for such benefits as a level percentage of their payroll costs.* Accrued costs are funded annually and were $XXX for 19X4. [Emphasis added.]

Alternatively, FASB 81 provided the following example to be used where benefit costs are expensed as paid:

In addition to providing pension benefits, the company and its subsidiaries provide certain health care and life insurance benefits for retired employees. Substantially all of the company's employees, including employees in foreign countries, may become eligible for those benefits if they reach normal retirement age while working for the company. *The cost of retiree health care and life insurance benefits is recognized as expense as claims are paid.* For 19X4, those costs totaled $XXX. [Emphasis added.]

With respect to its provision of health care and life insurance benefits to retirees, petitioner's financial statements for the years in issue stated as follows:

The company and its subsidiaries provide certain medical and life insurance benefits for retired employees under a variety of plans. Not all employees are eligible to receive these benefits. Eligibility depends upon the plan that is in effect at a particular location. *The cost of retiree health care and life insurance benefits is recognized as an expense as claims are paid.* * * * [Emphasis added.]

For the calendar years 1986, 1987, and 1988, petitioner's financial statements reported expenses for retiree health care and life insurance benefits of $3,757,000, $3,647,000, and $5,166,000, respectively.

*VEBA Trust Accounting for 1986, 1987, and 1988*

The certified account statements of the VEBA trust prepared by the Chase Manhattan Bank, N.A., as trustee summarize the annual activities of the VEBA trust as follows:

|                              | FYE 1986      | FYE 1987      | FYE 1988      |
| ---------------------------- | ------------- | ------------- | ------------- |
| Receipts:                    |               |               |               |
| Employer contributions       | $33,767,195   | $35,300,000   | $40,204,000   |
| Cash received from insurance companies | -0- | 7,130 | 603,981 |
| Net realized gain (loss)     | -0-           | 56,750        | 35,479        |
| Interest                     | 1,087,640     | 1,500,616     | 1,874,483     |
| Dividends                    | 7,569         | - - -         | 232,327       |
| Total receipts               | 34,862,404    | 36,864,496    | 42,950,270    |
| Disbursements:               |               |               |               |
| Benefit payments             | 13,662,378    | 17,140,532    | 15,567,896    |
| Expenses                     | 11,807        | 92,905        | 60,145        |
| Insurance premiums paid       | 15,635,541    | 17,685,562    | 18,698,759    |
| Other disbursements          | -0-           | 50,000        | 1,736,964     |
| Total disbursements          | 29,309,726    | 34,968,999    | 36,063,764    |
| Net increase (decrease) of assets | 5,552,678 | 1,895,497    | 6,886,506     |
| Assets at end of period      | 5,552,678     | 7,448,175     | 14,334,681    |

*Reserves for Incurred But Unpaid Claims*

The Equitable Life Assurance Co. determined that with respect to the medical benefits it administered for petitioner's units, the reserve for incurred but unpaid medical claims was $3,055,361 and $2,961,468 as of November 30, 1986 and 1987, respectively. The Great West Life Insurance Co. determined a reserve of $244,782 for incurred but unpaid medical claims for petitioner's Xynetics unit as of July 1987. Johnson & Higgins determined a reserve of $91,456 for incurred but unpaid medical claims for petitioner's Ultratech Stepper unit as of August 31, 1987. Aetna Life & Casualty determined a reserve of $151,950 for incurred but not reported medical claims for petitioner's Karkar Electronics unit as of August 31, 1987. Blue Cross & Blue Shield of Greater Philadelphia determined reserves of $366,932 and $272,070, respectively, for incurred but not reported health claims for petitioner's Leeds & Northrup unit as of August 31, 1987. Prudential Insurance Co. determined a reserve of $370,000 for incurred but not reported medical claims for petitioner's Leeds & Northrup unit as of September 1987. Blue Cross of Water-

town determined a reserve of $135,600 for incurred but not reported medical claims for petitioner's New York Air Brake unit as of October 31, 1987. Blue Cross/Blue Shield of Connecticut determined a reserve of $61,805 for incurred but not reported medical claims with respect to the claims it administered as of August 31, 1987.

For the VEBA trust years ended November 30, 1986 and 1987, if the safe harbor limit of section 419A(c)(5)(B)(ii) is not applicable, petitioner's account limit attributable to claims incurred but unpaid for medical benefits is equal to 26 percent and 27 percent, respectively, of its qualified direct costs (other than insurance premiums) for such taxable years.

## Notification to Employees

Prior to 1991, petitioner did not notify its employees or retirees, or any of the labor unions representing its employees, of the existence of the subject VEBA trust, with the exception of those employees involved in the establishment and implementation of the VEBA trust and the preparation and filing of governmental forms associated therewith. Commencing in 1991, petitioner notified the employees and retirees of petitioner and its subsidiaries, through distribution to them of summary plan descriptions, of the existence of the VEBA. No specific disclosure was made in this document of any reserves.

## Subsequent Events

In a memorandum to two of the four members of the pension board, dated December 9, 1988, petitioner's assistant treasurer addressed the continued funding of the VEBA trust. The memorandum stated that

Since establishing the VEBA in 1985, GSX has made annual "prefunding" contributions to the trust each December. These contributions represent estimates of the following year's cash disbursements for employee and retiree benefit payments. The contributions to the trust are tax deductible expenses in the year paid to the trust.

The memorandum stated that the after-tax return from making a 1988 prefunding contribution to the VEBA trust was less than petitioner's after-tax cost of capital and the memorandum therefore concluded that, on a cost of capital basis, prefunding was not attractive.

With respect to the termination of prefunding, the memorandum stated that

> If GSX elects not to prefund next year's disbursements this month, Russell Greenblatt has advised that as long as a nominal contribution to the VEBA is made in December 1988 (perhaps $5 million), GSX would likely not jeopardize (i) the deductibility of prior years' contributions or (ii) its ability to resume prefunding at a future point in time if desirable.

Russell Greenblatt was a partner with the law firm of Katten, Muchen, Zavis, Pearl & Galler, who advised petitioner with respect to certain aspects of the VEBA trust and contributions.

On December 13, 1988, the pension board approved a resolution to contribute $5 million to the VEBA trust on or before December 31, 1988. This contribution was made on December 28, 1988.

During petitioner's 1989 taxable year, it contributed a total of $24,250,000 to the VEBA trust in 12 contributions beginning May 11, 1989, ranging in amount from $1,500,000 to $3 million. A memorandum to the chairman of the pension board, dated December 4, 1989, stated in part as follows:

> As you know, we established the VEBA for employee and retiree medical benefit payments in 1985. In December of each of the first three years, we made a major prefunding contribution ($30–40 million) which estimated the following year's cash disbursements. These contributions are tax deductible in the year paid to the trust. In light of the share repurchase and the related cash outflow in December 1988, we considered reducing or discontinuing the annual VEBA prefunding contribution. Rather than contribute nothing, Russell Greenblatt, VEBA consultant, recommended that we contribute a nominal amount as a precaution against jeopardizing the tax benefits of prior years' and future years' prefunded contributions. We therefore prefunded $5 million in December 1988.
>
>     *   *   *   *   *   *   *
>
> Russell Greenblatt indicated to me that he did not feel it was necessary to prefund the VEBA during December 1989. He believes that it is not likely that contributing on a pay-as-you-go basis for 1990 will disqualify past or future tax deductions taken as a result of prefunding.

The memorandum also noted that it did not appear that there would be any "major change in corporate tax rates for 1990." Each Form 990, Return of Organization Exempt From Income Tax, filed by the VEBA trust for its fiscal years ended

November 30, 1989, 1990, and 1991, respectively, summarizes the annual activities of the VEBA trust as follows:

|  | FYE 1989 | FYE 1990 | FYE 1991 |
|---|---|---|---|
| Receipts: | | | |
| Employer contributions | $27,500,000 | $42,950,000 | $43,800,000 |
| Employee contributions | 167,262 | 99,328 | 454,699 |
| Cash from insurance companies and redeposits | 350,314 | 1,160,957 | -0- |
| Interfund transfers | -0- | 300,000 | -0- |
| Interest | 474,509 | 156,725 | 100,836 |
| Total receipts | 28,492,085 | 44,667,010 | 44,355,535 |
| Disbursements: | | | |
| Benefit payments | 40,711,951 | 44,624,024 | 45,382,893 |
| Expenses | 147,753 | 72,543 | 167,565 |
| Total disbursements | 40,859,704 | 44,696,567 | 45,550,458 |
| Net increase (decrease) of assets | (12,367,619) | (29,557) | (1,194,923) |
| Assets at end of period | 1,967,062 | 1,937,506 | 742,583 |

OPINION

Sections 419 and 419A, enacted as part of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98–369, section 511(a), 98 Stat. 854–860, limit the deductibility of employer contributions made to a welfare benefit fund, including a VEBA, to the fund's "qualified cost" for its taxable year ending with or within the employer's taxable year. Sec. 419(b); sec. 1.419–1T, Q&A–4, Temporary Income Tax Regs., 51 Fed. Reg. 4324 (Feb. 4, 1986). These provisions are generally effective with respect to contributions paid or accrued after December 31, 1985, in tax years ending after such date. DEFRA sec. 511(e), 98 Stat. 862.

A welfare benefit fund's qualified cost is the sum of its "qualified direct cost" and, subject to the limitation of section 419A(b), any addition to a "qualified asset account", less the fund's after-tax income. Sec. 419(c)(1) and (2). Any contribution to a welfare benefit fund in excess of the year's qualified cost is treated as a contribution by the employer to the fund during the succeeding taxable year. Sec. 419(d). The fund's qualified direct cost equals the amount, including adminis-

trative expenses, which would have been deductible by the employer in a given year, using the cash receipts and disbursements method of accounting, had such benefits been provided directly by the employer. Sec. 419(c)(3)(A).

The fund's qualified asset account consists of any assets set aside to provide for the payment of (1) disability benefits, (2) medical benefits, (3) SUB (supplemental unemployment compensation benefits) or severance pay benefits, or (4) life insurance benefits. Sec. 419A(a). However, additions to a qualified asset account are only included in the fund's qualified cost to the extent such additions do not exceed the fund's "account limit". Sec. 419A(b). It is the amount of the VEBA trust's account limit under section 419A which is in issue in this case.

With respect to both of the years in issue, petitioner and respondent disagree as to the amount includable in the VEBA trust's account limit in respect of (1) incurred and unpaid medical benefits claims within the meaning of section 419A(c)(1), and (2) a reserve for postretirement medical and life insurance benefits within the meaning of section 419A(c)(2). In considering these issues, we bear in mind that the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that the determinations are erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Moreover, deductions are strictly a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deductions claimed. Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. ___, 112 S. Ct. 1039, 1043 (1992).

A. *Incurred But Unpaid Claims*

Section 419A(c)(1) provides:

(1) IN GENERAL.—Except as otherwise provided in this subsection, the account limit for any qualified asset account for any taxable year is the amount reasonably and actuarially necessary to fund—
    (A) claims incurred but unpaid (as of the close of such taxable year) for benefits referred to in subsection (a), and
    (B) administrative costs with respect to such claims.

Section 419A(c)(5)(A) provides that unless there is an actuarial certification with respect to an account limit determined under section 419A(c), the account limit may not exceed cer-

tain "safe harbor" limits for such taxable year. With respect to medical benefits, section 419A(c)(5)(B)(ii) provides that the safe harbor limit for any taxable year is "35 percent of the qualified direct costs (other than insurance premiums) for the immediately preceding taxable year".

On brief, petitioner quotes section 419A(c)(5)(B)(ii) and provides a computation of 35 percent of the VEBA trust's direct qualified costs (excluding insurance premiums) for the trust's 1986 and 1987 fiscal years. Petitioner does not explicitly assert that it is entitled to treat its incurred but unpaid medical claims as equal to the safe harbor allowance, but seems to implicitly make such a claim by stating its other arguments as being alternatives to the application of the safe harbor limitation. Respondent argues that petitioner has failed to show, as required, that the safe harbor limit is an amount which is reasonably necessary to fund claims incurred but unpaid for medical benefits. In addition, respondent argues that petitioner's computations use qualified direct costs for the wrong years and fail to apportion administrative costs between insurance premiums and other qualified direct costs.

While titled "Safe Harbor Limits", section 419A(c)(5)(B) does not allow a taxpayer to automatically claim 35 percent of its prior year's qualified direct costs as the amount of incurred but unpaid medical claims. Rather, the statute merely allows a taxpayer to claim amounts at or below this threshold without obtaining an actuarial certification. Sec. 419A(c)(5)(A). This point is clarified by the legislative history, which states that

The conference agreement provides that an actuarial certification by a qualified actuary (determined under Treasury regulations) justifying the taxpayer's reserve computations is not necessary if the amount in the qualified asset account is below a prescribed safe harbor, equal to the sum of separate safe harbor amounts computed with respect to each benefit. * * * *Even if the safe harbors are satisfied, the taxpayer is to show that the reserves,* as allowed under the general standards provided by the bill (e.g., claims incurred but unpaid) *are reasonable.* [H. Conf. Rept. 98–861 (1984), 1984–3 C.B. (Vol. 2) 1, 412; emphasis added.]

In this case, petitioner has not offered evidence to demonstrate that an estimate of its incurred but unpaid medical claims equal to 35 percent of its qualified direct costs is reasonable. If petitioner's brief is intended to implicitly make

such a claim, we reject it for the above reasons. We also note that respondent is correct in contending that petitioner's computations use qualified direct costs for the wrong years and, as discussed below, fail to apportion administrative costs between insurance premiums and other qualified direct costs.

Petitioner next argues that the reserve for incurred but unpaid medical claims may be based upon the reserve numbers as reported by the insurance administrators. In sum, these amounts are less than the safe harbor amount computed by petitioner, and petitioner argues that, in the aggregate, they constitute "the amount reasonably and actuarially necessary" to fund the claims in question. Petitioner further states that

It is conceded that with the exception of the numbers provided from the administrator of the largest portion of Petitioner's medical claims, Equitable Life Assurance Company, these amounts were not calculated by the administrators as of VEBA year-end (either November 30, 1986 or November 30, 1987). Rather, they were rendered mid-year 1987. Nonetheless, because there were no significant changes in either the benefits provided through the VEBA, the number or class of employees or retirees covered under the VEBA or the administrators processing the claims, the numbers provided by the insurance administrators should be viewed as the amounts reasonably and actuarially necessary to fund medical claims incurred but unpaid at each year-end. * * * These letters from insurance administrators satisfy the requirements of Section 419A(c)(1), since neither that Section nor the legislative history thereto suggests that any actuarial estimate must be performed on, or as of, a particular date. The objective is to determine a fair and reasonable estimate of the liability.

In response to this argument, respondent points out that section 419A(c)(1)(A) states that the account limit is the amount necessary to fund "claims incurred but unpaid (*as of the close of such taxable year*)". (Emphasis added.) Respondent asserts that while the date upon which an administrator performs its estimate of claims incurred but unpaid may not be material, the statute clearly requires that the estimate must reflect amounts as of the end of the fund's year. Respondent argues that the estimates made by insurance administrators for claims incurred but unpaid as of mid-1987 have not been shown to accurately reflect claims incurred but unpaid as of either November 30, 1986, or November 30, 1987.

To establish that the mid-1987 estimates by insurance administrators accurately approximate claims incurred but unpaid as of the VEBA trust's yearends, petitioner cites only two facts. First, petitioner cites testimony by Laura Casper, petitioner's manager—health benefits, to the effect that, during the years in issue, there were no "substantial changes" in the number of employees covered through the VEBA trust, the number or identity of key employees, the substantive benefits provided, or the number of employees who were married. Second, petitioner cites the fact that the estimates of incurred but unpaid medical claims made by Equitable Life Assurance Co. as of November 30, 1986, and November 30, 1987, varied by only 3 percent.

With respect to the testimony of Laura Casper, petitioner has failed to clarify the level at which Casper would have considered a change in the above-referenced factors to be substantial. Additionally, even if we accept that the changes in the numerous factors used to compute claims incurred but unpaid were individually less than "substantial", it is unclear whether such changes might nevertheless, on a cumulative basis, produce a substantial change in the resulting estimate of claims incurred but unpaid. With respect to the small change in the yearend determinations made by Equitable Life Assurance Co., petitioner has failed to establish that claims incurred but unpaid with respect to its different divisions and subsidiaries tend to increase and decrease at the same times and by similar percentages. For these reasons, we reject petitioner's argument that it is entitled to compute its incurred but unpaid medical claims based on the estimates made by its insurance administrators.

The parties have stipulated that if petitioner's alternative arguments are rejected, petitioner's account limit for the years in issue attributable to claims incurred but unpaid for medical benefits is equal to 26 percent and 27 percent, respectively, of the VEBA trust's qualified direct costs (other than insurance premiums) for its taxable years ended November 30, 1986, and November 30, 1987.

The fiscal year 1986 and 1987 disbursements of the VEBA trust were as follows:

|  | FYE 11/30/86 | FYE 11/30/87 |
|---|---|---|
| Benefit payments | $13,662,378 | $17,140,532 |
| Administrative costs | 11,807 | 92,905 |
| Insurance premiums paid | 15,635,541 | 17,685,562 |
| Other disbursements | -0- | 50,000 |
| Total disbursements | 29,309,726 | 34,968,999 |

The parties have each treated the $50,000 labeled "other disbursements" for the VEBA trust's 1987 fiscal year as part of the benefit payments made by the trust during such year. The parties, however, differ on the proper treatment of the VEBA trust's administrative costs and on the annualization of all 1986 disbursements.

Petitioner has treated all of the administrative costs as allocable to benefit payments. Respondent, on the other hand, has made a pro rata allocation of the costs between benefit payments and insurance premiums. Because the stipulation of the parties uses a base for determining claims incurred but unpaid that excludes insurance premiums, and since section 419A(c)(1) only allows for the inclusion in the account limit of administrative costs that are allocable to claims incurred but unpaid, we believe that it is appropriate to exclude administrative costs that are attributable to insurance premiums. Petitioner has failed to show that an allocation of administrative costs other than that asserted by respondent is proper. We therefore accept respondent's pro rata allocation of administrative costs.

With respect to the annualization of the 1986 disbursements, respondent's computations multiply the 1986 expenses by twelve-elevenths to account for the fact that the VEBA trust's 1986 fiscal year consisted of only 11 months. Petitioner's computations did not make this adjustment. As respondent's computations result in a greater account limit for petitioner's 1986 taxable year, we will accept respondent's approach to annualization.

Based on the above, we hold that the proper computation of petitioner's account limit under section 419A(c)(1) attrib-

utable to claims incurred but unpaid for medical benefits is as follows:

|  | FYE 11/30/86 | FYE 11/30/87 |
|---|---|---|
| Benefit payments | $13,662,378 | $17,140,532 |
| Other disbursements | -0- | 50,000 |
| Allocable administrative costs | 5,506 | 45,793 |
| Direct qualified costs (excluding insurance premiums) | 13,667,884 | 17,236,325 |
| Annualization adjustment | $\times\ {}^{12}\!/_{11}$ | N/A |
| Annualized direct qualified costs | 14,910,419 | 17,236,325 |
| Stipulated percentages | $\times$ .26 | $\times$ .27 |
| Claims incurred but unpaid for medical benefits | 3,876,709 | 4,653,808 |

## B. *Reserve for Postretirement Benefits*

Section 419A(c)(2) provides:

(2) ADDITIONAL RESERVE FOR POST-RETIREMENT MEDICAL AND LIFE INSURANCE BENEFITS.—The account limit for any taxable year may include a reserve funded over the working lives of the covered employees and actuarially determined on a level basis (using assumptions that are reasonable in the aggregate) as necessary for—

(A) post-retirement medical benefits to be provided to covered employees (determined on the basis of current medical costs), or

(B) post-retirement life insurance benefits to be provided to covered employees.

Petitioner contends that the VEBA trust's account limit includes a reserve for postretirement medical and life insurance benefits of $35,302,354 and $39,981,437 for 1986 and 1987, respectively, as determined by Buck Consultants. Respondent asserts that, because a reserve for postretirement medical and life insurance benefits was not established during the years in issue, the account limit attributable to a reserve for such benefits is zero. Alternatively, respondent asserts that if it is determined that petitioner is entitled to additions to the account limit under section 419A(c)(2), the amounts properly computed are $6,982,810 and $10,912,941 for 1986 and 1987, respectively.

Petitioner established the VEBA trust as a tool for annually prefunding the benefit payments it expected to have come

due in the calendar year following the calendar year of each contribution. (Petitioner, unlike the VEBA trust, is on a calendar year basis.) Initially, this was to be accomplished by making a large contribution to the VEBA trust shortly before the effective date of sections 419 and 419A and then renewing the balance in the VEBA near the end of each subsequent year. (DEFRA section 511(a), 98 Stat. 854, enacted in 1984, added sections 419 and 419A to the Code, effective for contributions paid or accrued after December 31, 1985, in taxable years ending after December 31, 1985, with certain nongermane exceptions.) The deduction of the post-1985 contributions was to be based on the VEBA trust's qualified direct costs (within the meaning of section 419(c)(3)) for the trust's fiscal year ending immediately preceding the December in which the contribution was made. The VEBA trust adopted a November 30 yearend, thereby allowing the VEBA trust 11 months prior to the end of its taxable year within which to disburse the contributions received in the preceding December and thereby avoiding the application of section 512 to the trust's income. (Section 512 defines "unrelated business taxable income", and can be applicable under special rules to certain specified organizations, including section 501(c)(9) organizations such as the VEBA trust in this case. See sec. 512(a)(3)(B) and (a)(3)(E)(i); sec. 1.512(a)–5T, Q&A–3, Temporary Income Tax Regs., 51 Fed. Reg. 4332 (Feb. 4, 1986). See discussion *infra* at p. 241.)

The temporary regulations issued in early 1986 denied a deduction for 1986 contributions to the VEBA trust to the extent that the amount in the fund at yearend exceeded the VEBA trust's account limit for such year, even though arguably section 419 would otherwise have allowed such a deduction. Sec. 1.419–1T, Q&A–5(b), Temporary Income Tax Regs., 51 Fed. Reg. 4324 (Feb. 4, 1986). For this purpose, amounts contributed between the VEBA trust's yearend and petitioner's yearend are to be treated as assets held by the VEBA trust as of its yearend. *Id.* Section 419 does not itself expressly contain this limiting requirement. This regulation prevented petitioner from being able to use the qualified direct costs for the trust's 1986 fiscal year as the basis for deducting prefunding contributions to the VEBA trust in December 1986. Petitioner has not challenged the validity of

this regulation, and the validity of the regulation is not at issue in this case.

In response to the 1986 temporary regulations, Dolgin & Associates recommended that petitioner prefund a reserve for incurred but unpaid claims and establish a reserve for post-retirement medical benefits. The 1986 proposal stated that because the reserve for postretirement benefits would be substantially greater than the actual benefits paid to retirees during a year, there would be sufficient funds available in the VEBA trust to pay medical benefits for active employees. The proposal emphasized that petitioner would "be prefunding the VEBA only for amounts that would have to be paid to employees during the next year regardless of whether a VEBA is established." Petitioner thereafter adopted this approach to funding the VEBA trust and paid Dolgin & Associates for its advice.

Based on Buck Consultants' determinations, $63,300,000 of petitioner's December 29, 1986, and December 29, 1987, contributions were alleged to be attributable to reserves for accrued retiree liabilities. For the calendar years 1987 and 1988, petitioner's financial statements reported expenses for retiree health care and life insurance benefits totaling $8,813,000. However, between November 30, 1986, and November 30, 1988, the balance in the VEBA trust increased by only $8,782,003. Thus, it appears that at least $45,700,000 (72 percent) of the contributions alleged to be attributable to accrued retiree liabilities was used to pay active employee benefits during 1987 and 1988. Additionally, the balance remaining in the VEBA trust as of the end of its fiscal year 1988, plus the $5 million contribution made in December 1988, were almost completely depleted by the end of its fiscal year 1989. It is reasonable to assume that, as in prior years, most of these amounts were expended to pay benefits to active employees during 1989.

For purposes of its financial reporting during the years in issue, petitioner made no disclosure of the establishment or maintenance of reserves for postretirement medical or life insurance benefits. Similarly, petitioner made no disclosure to its employees or their unions of the establishment or maintenance of reserves for postretirement medical or life insurance benefits. Memoranda drafted by petitioner's executives after the years in issue state that the contributions

made to the VEBA trust during the years in issue were "estimates of the following year's cash disbursements". The projected budgets for the VEBA trust included in the Form 1024, submitted on January 16, 1987, show projected yearend balances of $5,552,678, $7,983,000, and $1,448,000 for its fiscal years ended in 1986, 1987, and 1988, respectively, and do not show reserves established for any purpose.

Based upon these facts, it is clear that the VEBA trust did not accumulate assets for the purpose of funding a reserve for postretirement medical and life insurance benefits. Petitioner did not intend for the VEBA trust to establish a reserve or accumulate assets for the purpose of funding a reserve. The contributions made by petitioner were intended to fund the estimated benefit expenses which were expected to be incurred in the year following the contribution. While petitioner's petition alleges that "A retiree reserve was, in fact, established and funded in accordance with section 419A(c)(2)", petitioner appears to have abandoned this position on brief, stating that

It was never intended nor represented that any portion of any VEBA contribution would be spent in any particular way, other than to provide permitted benefits as expenses were incurred.

Section 419A(c)(2) provides that "The account limit * * * may include a *reserve funded* over the working lives of the covered employees * * * as necessary for" postretirement medical and life insurance benefits. (Emphasis added.) On its face, the language "reserve funded" suggests that Congress intended this provision to allow the *accumulation* of funds by a welfare benefit fund for the purpose of providing postretirement benefits. Interpreting the provision in this manner, respondent asserts that this provision requires that a reserve in fact be created and funded.

On brief, petitioner objects to respondent's reliance on the "simplistic position that the words mean what they purport to say." Petitioner argues that if analyzed within the context of the statutory framework, it is clear that the term "reserve" in section 419A(c)(2) refers to a liability and that the clause following the term "reserve" is only intended to be a description of the required method of measuring this liability. Petitioner's argument is that

As a provision setting forth the measure of the maximum amount of the permissible reserve liability component of a welfare benefit fund's account limit, Section 419A(c)(2) is relevant only in computing the fund's qualified cost and therefore the contributing taxpayer's maximum allowable deduction under Sections 419A(b) and 419(b). It bears no direct relationship to a welfare benefit fund's assets.

Thus, petitioner argues that section 419A(c)(2) does not require the establishment of a funded reserve in order for an amount to be included in the account limit.

Whether section 419A(c)(2) requires the accumulation of assets in the nature of a funded reserve appears to be an issue of first impression. However, the principal objective in interpreting any statute is to determine Congress' intent in using the statutory language being construed. *United States v. American Trucking Associations,* 310 U.S. 534, 542 (1940); *Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 93–94 (1934). Where the statute is ambiguous, it is well established that we may look to its legislative history and to the reason for its enactment. *United States v. American Trucking Associations, supra* at 543–544; *U.S. Padding Corp. v. Commissioner,* 88 T.C. 177, 184 (1987), affd. 865 F.2d 750 (6th Cir. 1989). On its face, the provision here in issue does not appear to be ambiguous. Nevertheless, because of petitioner's vehement assertions that the phrase "reserve funded" does not, standing alone, have a commonly understood meaning, we will look to legislative history for additional guidance.

The portion of the conference committee report relating to section 419A(c)(2) states, in part:

The qualified asset account limits allow amounts *reasonably necessary to accumulate reserves* under a welfare benefit plan so that the medical benefit or life insurance (including death benefit) payable to a retired employee during retirement is fully funded upon retirement. * * * The conferees intend that the Treasury Department prescribe rules requiring that *the funding of retiree benefits* be based on reasonable and consistently applied actuarial cost methods * * * [H. Conf. Rept. 98–861 (1984), 1984–3 C.B. (Vol. 2) 1, 411; emphasis added.]

Thus, the legislative history supports respondent's argument that Congress intended section 419A(c)(2) to permit the accumulation of funds for purposes of funding postretirement benefits. Under petitioner's interpretation, contributions to a VEBA which are deducted pursuant to section 419A(c)(2)

would not necessarily result in any funds being accumulated for the purpose of providing postretirement benefits. As demonstrated, this result is diametrically at odds with congressional intent.

Certain related provisions offer further support for respondent's position. As part of DEFRA, Congress amended the unrelated business income tax (UBIT) provisions of section 512 as they apply to welfare benefit funds. DEFRA sec. 511(b), 98 Stat. 860–861. In general, the income of a welfare benefit fund is not subject to UBIT if the total assets of the fund at yearend do not exceed the account limit. Sec. 512(a)(3). However, for this purpose, the account limit is to be determined "not taking into account any reserve described in section 419A(c)(2)(A) for post-retirement medical benefits". Sec. 512(a)(3)(E)(i).

This portion of DEFRA included a transition rule which prevented the application of the UBIT to "income attributable to an existing reserve for post-retirement medical or life insurance benefits." Sec. 512(a)(3)(E)(ii). The legislative history of this provision states in part that

> The [conference] agreement provides that an existing reserve is the amount of assets set aside as of the close of the last plan year ending before the date of the enactment of the bill for purposes of providing such benefits. The transition relief applies to a reserve to provide such benefits only to the extent the reserve does not exceed the amount that could be accumulated under the principles of Rev. Ruls. 69–382, 1969[–2] C.B. 28, and 73–599, 1973–2 C.B. 40. * * * [H. Conf. Rept. 98–861 (1984), 1984–3 C.B. (Vol. 2) 1, 417.]

This quote from the legislative history is relevant for two reasons. First, the conferees again spoke of a "reserve" in terms of an accumulation (as well as "assets set aside"). Second, it demonstrates that in drafting the welfare benefit fund provisions, the conferees were aware of Rev. Rul. 69–382, 1969–2 C.B. 28, and Rev. Rul. 73–599, 1973–2 C.B. 40.

Rev. Rul. 69–382, 1969–2 C.B. at 28, dealt with the tax consequences resulting from the payment of premiums on group term life and health and accident coverage where a portion of the premium was added to a reserve for continued insurance on retired employees (defined in the ruling as a "retired lives reserve"). The ruling states that

The purpose of the retired lives reserve is to *accumulate a fund* to be used to pay all or a portion of the cost for continuing insurance coverage on retired employees. * * * [*Id.;* emphasis added.]

The ruling approved the deduction of the portion of the premium attributable to such reserve so long as

The amount added to the retired lives reserve is not greater than an amount which would be required to fairly allocate the cost of the insurance coverage provided over the working lives of the employees involved. [*Id.*]

Rev. Rul. 73–599, 1973–2 C.B. at 41, dealt with the tax consequences of the transfer to a section 501(c)(9) trust of a "retired lives reserve" created with a portion of the premiums paid on group life and health insurance. The ruling describes the reserve as "established and maintained * * * for the purpose of *accumulating a fund* that would be used to pay all or a portion of the cost of continuing coverage for the retired employees." *Id.* (emphasis added). The ruling held that the transfer of the reserve balance at the direction of the employer resulted in the inclusion of the balance in the employer's income, but that

out of the entire amount transferred from the insurance company to the trust, which amount is held for retired lives, the taxpayer may have that portion that is actuarially determined and made on a level basis represent its otherwise payable annual contribution to the fund and only to that extent will it constitute a deduction under section 162 in the year of transfer. * * * [*Id.*, 1973–2 C.B. at 42.]

In sum, these rulings referred to reserves for postretirement benefits as accumulations of assets and state that the deduction of contributions to such reserves is limited to amounts allocated "over the working lives of the employees", "actuarially determined", and made "on a level basis". The legislative history demonstrates that Congress was aware of these rulings when it adopted the language of section 419A(c)(2) allowing an addition to the account limit for "a reserve funded over the working lives of the covered employees and actuarially determined on a level basis". Thus, it is difficult to accept petitioner's contention that Congress merely intended this provision to prescribe a method of measuring a liability, while the legislative history of a related provision refers to rulings that use similar language to refer to the accumulation of assets in a funded reserve.

In addition to explaining the nature of the deduction which Congress intended to allow under section 419A(c)(2), the legislative history of DEFRA also sheds light on the nature of deductions that Congress intended to disallow by the enactment of sections 419 and 419A. Section 419(e) provides a broad definition for the term "welfare benefit fund" and, in section 419(e)(3)(C), grants special regulatory authority to the Treasury to expand the definition of the term "fund". The portion of the conference committee report relating to this provision states, in part, that

In prescribing regulations relating to the definition of the term "fund," the conferees wish to emphasize that *the principal purpose of this provision of the bill is to prevent employers from taking premature deductions, for expenses which have not yet been incurred,* by interposing an intermediary organization which holds assets which are used to provide benefits to the employees of the employer. * * * [H. Conf. Rept. 98–861, *supra,* 1984–3 C.B. (Vol. 2) at 409; emphasis added.]

Petitioner argues that this portion of the legislative history is irrelevant to this case because section 419(e) is not at issue. However, this portion of the legislative history demonstrates that Congress believed that in enacting sections 419 and 419A it was preventing employers "from taking premature deductions, for expenses which have not yet been incurred". Section 419(e) and its grant of special regulatory authority to the Treasury were aimed at making sure these restrictions were not avoided.

Petitioner, however, asserts an interpretation of section 419A(c)(2) that clearly would allow the taking of premature deductions for expenses that have not been incurred. Petitioner's contributions to the VEBA trust were intended to, and primarily did, satisfy claims of active employees in the year following the year of contribution. Petitioner did not, and never intended to, accumulate funds in the VEBA trust so that postretirement benefits would be funded upon the retirement of its employees.

As previously stated, the plain language of section 419A(c)(2) suggests that Congress intended to allow *the accumulation of funds* over the working lives of employees for the purpose of providing postretirement benefits. This interpretation is supported by repeated references in the legislative history to the accumulation of reserves for pur-

poses of funding postretirement benefits and by the reference to revenue rulings which dealt with reserves used to accumulate funds for postretirement benefits. Additionally, the legislative history also establishes that Congress intended "to prevent employers from taking premature deductions, for expenses which have not yet been incurred". Thus, both the plain language of the provision and the legislative history fully demonstrate that petitioner's interpretation of section 419A(c)(2) is erroneous.

Nevertheless, petitioner points out that all of the actuaries who testified in the trial of this case agreed that the term "reserve" is an actuarial term of art meaning "liability". This point, however, does not necessarily support petitioner's position that "reserve funded over the working lives of the covered employees" is merely a method of measuring liability. Petitioner notes on brief that one of the actuaries called by respondent testified that a funded reserve is not necessarily an account, fund, trust, or other pool of assets, but may be similar to a reserve in the insurance area, which is funded by general assets and not segregated assets. We agree. However, in accordance with the intentions of petitioner, the VEBA trust did not retain sufficient general assets to fund the reserves claimed by petitioner.

Petitioner also cites other provisions of the Code that require that assets be "set aside" or that a "separate account" be "established" as examples of the type of language Congress would have used if it had intended that section 419A(c)(2) affect the use of the VEBA trust's funds. See secs. 401(h), 419A(a), 419A(d). However, if the language of section 419A(c)(2) is read to require the creation of a reserve funded with general assets rather than segregated assets, the language of these other provisions would not have been appropriate. More importantly, this argument is simply not sufficient to overcome the unambiguous statements of the legislative history regarding the accumulation of assets and the funding of benefits.

Petitioner also cites language from section 501(c)(9), which provides tax-exempt status to a VEBA that provides "for the payment of life, sick, accident, or other benefits", and section 512(a)(3)(B), which generally provides that income of a VEBA is not subject to the UBIT to the extent it is set aside "for the payment of life, sick, accident, or other benefits". Petitioner

argues that the quoted language of these provisions demonstrates that funds within a VEBA are intended to be "fungible" and that all funds are to be available for the payment of any type of permissible benefit. Petitioner cites regulations promulgated under section 501(c)(9) to further support this view. It is not at all apparent that the language of the cited provisions should be different as a result of section 419A(c)(2)'s requiring that a funded reserve be established. Petitioner has failed to clarify this point. In addition, the section 509 regulations cited by petitioner were promulgated 4 years prior to the enactment of sections 419 and 419A, and would therefore be largely irrelevant even if they did support the view that all funds of a VEBA are to be available for the payment of any type of permissible benefit.

Next, petitioner argues that its position is supported by the elective aggregation rule of section 419A(h)(1)(B). This provision allows an employer to elect to treat two or more welfare benefit funds as a single fund for purposes of section 419A. Petitioner argues that this again demonstrates that the account limit components

are merely measurements, and that contributions made based on such component measurements are entirely fungible so that contributions made to one trust could be based on the account limit of another trust.

In making this argument, however, petitioner ignores the restriction contained in section 419A(h)(1)(B) that two or more funds may be treated as one fund only "to the extent not inconsistent with the purposes of this subpart [sections 419 and 419A] and section 512". As previously discussed, the legislative history demonstrates that petitioner's position is inconsistent with the purposes of sections 419 and 419A. In our view, if a reserve for postretirement benefits is not funded, no amount may be added to the account limit under section 419A(c)(2) for any purpose, including aggregation under section 419A(h)(1)(B).

Petitioner also argues that respondent's interpretation of the statute creates uncertainties and incongruities with respect to its application. First, petitioner argues that this interpretation would require tracking of funds and thus a separate account requirement. Second, petitioner argues that respondent's interpretation would require minimum annual funding of the VEBA trust because funding rather than liabil-

ity accrual would have to be level on a year-to-year basis. Third, because no penalties have been explicitly set forth by Congress with respect to the diversion of VEBA reserve funds, it is unclear what consequences would result from the creation of a reserve for postretirement benefits and the later diversion of its assets to other purposes.

With respect to petitioner's argument that respondent's interpretation of section 419A(c)(2) would require a separate accounting requirement, respondent contends that it is sufficient that the reserve required by section 419A(c)(2) be funded with general rather than specific assets. This interpretation appears consistent with legislative intent and requires only that the overall balance maintained in the VEBA be sufficient to support the postretirement reserve. It does not appear to require that a separate account be established with respect to the reserve.

On brief, respondent rejects petitioner's argument that respondent's interpretation of section 419A(c)(2) would require minimum annual funding of the VEBA trust, but fails to explain the basis for her position. It may be that section 419A(c)(2) should be applied only on a prospective basis in years in which contributions are actually made to the welfare benefit fund. However, because petitioner has failed the minimum requirement of establishing a funded reserve, this case does not require us to decide issues related to the required rate of funding under section 419A(c)(2).

Respondent has not stated her position with respect to the consequences which would result from the establishment of a reserve for postretirement benefits followed by the later diversion of such reserve to provide current benefits. Again, however, this issue is not presented by this case because petitioner failed to establish a reserve.

We recognize that the interpretation of section 419A(c)(2) which we are adopting may leave open related issues such as the rate of required funding and the consequences of diversion of a reserve. However, such uncertainties cannot justify ignoring the plain meaning and legislative history of section 419A(c)(2). As stated by the Supreme Court,

Judicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions, but cannot justify dis-

regard of what Congress has plainly and intentionally provided. * * * [*Commissioner v. Asphalt Prods. Co.,* 482 U.S. 117, 121 (1987).]

See also *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571 (1982); *United States v. Mansfield Tire & Rubber Co.,* 942 F.2d 1055, 1058 (6th Cir. 1991). Here, we do not find respondent's interpretation of section 419A(c)(2) to be unreasonable. Quite the opposite, as the case now before us clearly demonstrates, this interpretation is necessary to accomplish the intent of Congress to prevent the premature deduction of expenses which have not been incurred. To the extent our interpretation of section 419A(c)(2) leaves open related issues the resolution of which are not required by this case, we can only hope that Congress or the Treasury will provide additional guidance.

For the reasons stated above, petitioner may not include any amount in its account limit for the years in issue in respect of a reserve for postretirement medical and life insurance benefits within the meaning of section 419A(c)(2).

C. *Conclusion*

Based on the foregoing, we hold that petitioner's account limit under section 419A(c)(1) attributable to claims incurred but unpaid for medical benefits is $3,876,709 and $4,653,808 for its taxable years 1986 and 1987, respectively. Additionally, petitioner is not entitled to include any amount in its account limit for the years in issue in respect of a reserve for postretirement medical and life insurance benefits within the meaning of section 419A(c)(2). To reflect these holdings,

*An appropriate order will be issued.*