109 T.C. No. 9

UNITED STATES TAX COURT

SQUARE D COMPANY AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 15047-94, 4991-95.      Filed October 9, 1997.

During December 1982, P established a voluntary
employees' beneficiary association (VEBA) which
qualified for exemption under sec. 501(c)(9), I.R.C.,
and as a welfare benefit fund (WBF) under sec. 419(e),
I.R.C.  During the initial years of the VEBA, P
contributed amounts to the VEBA to provide certain
employee welfare benefits and for claims which were
incurred but unpaid (CIBU's) at yearend.  During 1985,
P changed its VEBA yearend to Nov. 30, while P retained
a calendar yearend.  Also during 1985, P began
prefunding for benefits the VEBA was expected to
provide in later years.

1. Held, P is not automatically entitled to the
safe harbor percentages of sec. 419A(c)(5)(B)(i) and
(ii), I.R.C., in computing additions to its account
limit for CIBU's for the taxable years 1986 and 1987.
General Signal Corp. & Subs. v. Commissioner, 103 T.C.
216 (1994), followed.

2. _Held, further_, P's CIBU's for 1986 and 1987 are based upon stipulated percentages of its qualified direct costs for each year. See sec. 419A(c)(1), (5), I.R.C.

3. _Held, further_, the creation of a reserve under sec. 419A(c)(2), I.R.C., requires the accumulation of assets and does not result from the accrual of a liability. _General Signal Corp. & Subs v. Commissioner_, _supra_, followed.

4. _Held, further_, because P's contributions to its VEBA during 1986 did not result in the creation of a reserve for postretirement medical benefits for its employees, P is not entitled to an increase in its account limit for 1986 pursuant to sec. 419A(c)(2), I.R.C., with respect to that year.

5. _Held, further_, the limit of sec. 1.419-1T, Q&A-5(b)(1), Temporary Income Tax Regs., 51 Fed. Reg. 4324 (Feb. 4, 1986), is valid.

_Robert H. Aland_, _Gregg Douglas Lemein_, _Taylor S. Reid_, _Tamara L. Frantzen_, _Maura Ann McBreen_, and _Brian K. Wydajewski_, for petitioner in docket No. 15047-94.

_Robert H. Aland_, _Gregg Douglas Lemein_, _Neal J. Block_, _Frederick Edward Henry III_, _Maura Ann McBreen_, _Tamara L. Frantzen_, _Taylor S. Reid_, _Brett L. Gold_, and _Brian K. Wydajewski_, for petitioner in docket No. 4991-95.

_Lawrence C. Letkewicz_ and _Randall P. Andreozzi_, for respondent.

OPINION

WELLS, _Chief Judge_: The instant cases were consolidated for purposes of trial, briefing, and opinion (hereinafter referred to as the instant case). The instant case is before the Court on

the parties' cross-motions for partial summary judgment.  We must decide whether petitioner's contribution to its trust created as part of its voluntary employees' beneficiary association (VEBA) plan for the 1986 taxable year is deductible.  Specifically, we must decide:  (1) Whether petitioner is entitled to the safe harbor limits of section 419A(c)(5)(B)(i) and (ii)[1] in computing the addition to the qualified asset account for medical, dental, and short-term disability (also referred to as accident and sickness) benefit claims and associated administrative costs pursuant to section 419A(c)(1); (2) whether petitioner's $27 million contribution to its VEBA trust during 1986 constituted "a reserve funded over the working lives of the covered employees" for postretirement medical benefits (PRMB's) within the meaning of section 419A(c)(2); and (3) whether the limitation of section 1.419-1T, Q&A-5(b)(1), Temporary Income Tax Regs., 51 Fed. Reg. 4324 (Feb. 4, 1986), is valid.

## Background

Some of the facts and certain exhibits have been stipulated by the parties for the purpose of the instant motion.  The stipulation of facts is incorporated in this Opinion by reference.  When its petition was filed, petitioner's principal office was located in Palatine, Illinois.  Petitioner is a

---

[1]    All Code and section references are to the Internal Revenue Code in effect for the year at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

worldwide manufacturer of electrical distribution and control equipment and electronic materials, components, products, and systems for industrial and construction markets.  Petitioner is an accrual basis taxpayer and uses a calendar yearend.  Prior to June 1991, petitioner's common stock was traded on the New York Stock Exchange.

Establishment of the VEBA Trust

On December 22, 1982, petitioner established the Square D Company and Subsidiaries Employee Welfare Benefit Trust (the VEBA Trust) to serve as the funding vehicle for a single welfare benefit plan, known as the Square D Company and Subsidiaries Employee Welfare Benefit Plan (the Plan).  The Plan provided for medical, dental, accident, sickness (short-term disability), and long-term disability benefits for eligible employees and retirees of petitioner and its subsidiaries.  The trustees of the VEBA Trust were Dexter S. Free, James M. Vetta, and Donald E. Wilson, all of whom are officers of petitioner.  The trust agreement authorized the establishment of a depository account for trust assets.  Funds of the VEBA Trust were deposited in an account with First Interstate Bank of Washington, N.A., pursuant to a custodial agreement dated December 31, 1982.  The VEBA Trust was a "welfare benefit fund" under section 419(e) at all relevant times.

Prior to 1985, petitioner funded the VEBA Trust during each year for that year's employee benefit liabilities (and

administrative costs) as they were incurred (although it could also have made a contribution for the following year's expected liabilities). Petitioner also funded the VEBA Trust at yearend for employee benefit claims that were incurred but unpaid (CIBU's) and associated administrative costs based on actuarial assumptions made by Prudential Insurance Co. (Prudential), petitioner's medical claims adjuster, with respect to medical, dental, accident, and sickness claims, and the Wyatt Co. (Wyatt), petitioner's actuarial firm, with respect to long-term disability claims. Those assumptions were then reviewed by petitioner's risk management department. Prior to 1985, the VEBA Trust was not funded for any other liabilities. Petitioner contributed a total of $57,992,061 to the VEBA Trust between December 31, 1982, and December 31, 1984, as follows:

| Trust Yearend | Amount of Contribution |
|---------------|------------------------|
| Dec. 31, 1982 | $4,806,000 |
| Dec. 31, 1983 | 25,761,346 |
| Dec. 31, 1984 | 27,424,715 |

Petitioner's 1985 VEBA Trust Contributions

During November 1985, the VEBA Trust filed with respondent a Form 1128 to change its taxable year from a calendar year to a fiscal year ending November 30. This change was approved by respondent and became effective as of November 30, 1985. An internal memorandum dated October 3, 1985, from R.G. Halliday, a member of petitioner's tax department, to Dexter S. Free, an officer of petitioner and trustee of the VEBA Trust, stated that

The change in the Trust year would allow the contribution to be made in December of future years, thus providing a permanent deferral of the related tax liability.  This change is necessary because the limit on the addition to a qualified asset account is tested at the Trust's year end.  With the contribution in December, a full year's funding could be made, and therefore, the addition to asset account limits would be satisfied (at November 30), and the deduction would still fall within Square D's calendar year.

*     *     *     *     *     *     *

Conclusion

The delay in the enactment of the more stringent funding requirements passed by the Tax Reform Act of 1984 has left open a window of opportunity that will be closed on January 1, 1986.  By accruing or actually making a payment to the VEBA, Square D will be able to accelerate a deduction which would otherwise be taken in the following year.  Continuing this funding pattern in future years will allow Square D in essence to receive a permanent deferral of tax on the amount.

An internal memorandum dated December 17, 1985, from D.S. Free to

D. E. Wilson and J. M. Vetta states:

The Tax Department has proposed that the Trust adopt a fiscal taxable year ending November 30th in order to avoid the new limitation on pre-funding of the Trust. Because the limit on additions to the Trust's reserves is tested at the Trust's year end, the fiscal year would allow the Trust to meet the test as of November 30th, which means Square D could pre-fund its entire liability for the following year in December of the current year.

Pre-funding of the Trust will allow Square D to accelerate the recognition, for tax purposes only, of $36,500,000 of 1986 expenses into 1985.  Assuming the Company's contributions to the Trust do not decline in future years, we will have deferred payment of $18,250,000 of taxes permanently.  If tax reform legislation produces a corporate tax decrease, this plan will also produce a permanent tax benefit.

Petitioner did not change the nature or type of medical, dental, accident, sickness, and long-term disability benefits paid through the VEBA Trust. Additionally, petitioner did not change the procedures for payment of such benefit claims by the VEBA Trust at the time the yearend was changed.

The VEBA Trust's account balance at First Interstate on November 30, 1985, was $1,835,475. On December 11 and 20, 1985, petitioner contributed $700,000 and $300,000, respectively, to the VEBA Trust. On December 27, 1985, petitioner contributed $36,600,000 to the VEBA Trust. Petitioner claimed a deduction on its 1985 Federal income tax return for these contributions ($37,600,000) and other contributions made earlier during 1985. Of the total deduction, $1,937,701 was disallowed by respondent as an amount in excess of petitioner's allowable deduction. In accordance with the trust agreement, the VEBA Trust's assets, including the December 1985 contributions and the VEBA Trust's investment income, were used to pay medical, dental, accident, sickness, and long-term disability benefits (and administrative costs) under the plan to petitioner's employees and retirees as those benefits (and costs) came due during the 1986 plan year.[2] No contributions were made to the VEBA Trust from January 1986 through November 30, 1986. The VEBA's account balance at First Interstate on November 30, 1986, was $11,297,108.

---

[2]    References to VEBA Trust years after the yearend change include December of the previous year.

Petitioner's 1986 VEBA Trust Contribution

During 1986, petitioner became aware that the regulations might remove the benefit of the VEBA Trust's yearend on November 30. An internal memorandum dated April 23, 1986, states:

> the statute and the Committee Report could be interpreted as allowing the qualified asset account to be tested at the Trust's year end. Therefore, we changed the Trust's year end to November 30th. At November 30th, the Trust's reserves will always be low enough to meet the qualified asset account limit. The Trust can then be prefunded in December and a deduction for the contribution taken on Square D's return for the calendar year.

> Pursuant to the regulations, the amount of an employer's deduction for contributions to a §501(c)(9) year is now limited to the qualified cost of the trust for the taxable year of the trust which falls within the taxable year of the employer. Thus, there is no advantage to our trust having a November fiscal year end as the qualified cost test will always be applied as of Square D Company's calendar year end. In other words, the new regulations will prevent Square D Company from prefunding the trust for 1987 and deducting the contribution in 1986.

> Bob, it is obvious the IRS perceived the loophole created by the statute's ambiguity about whose taxable year, the trust's or the corporation's, should be used to measure the qualified cost has opened for taxpayers. It remains to be seen whether the IRS can correct this defect in the statute through regulations. We are going to contact our legal counsel to see if there is any merit in challenging the regulations. In the meantime, we are proceeding under the assumption that Square D Company will not be allowed to deduct contributions to the Trust in 1986.

On December 30, 1986, petitioner contributed $27 million to the VEBA Trust and claimed a deduction for the full amount of this contribution on its 1986 Federal income tax return. That $27 million contribution was petitioner's only contribution to

the VEBA Trust during the 1986 calendar year. The amount of the 1986 contribution was based on an actuarial valuation by Wyatt. Wyatt ascertained that the maximum deductible contribution for 1986 for PRMB's was $25,391,059. Administrative expenses were considered to be 6.5 percent of the PRMB's, or $1,650,419, making the total deductible amount $27,041,478. Regarding the calculation of the deductible amounts, a December 24, 1986, letter to petitioner from Wyatt stated the following:

> As mentioned on the phone, there are rulings several years old providing slim guidance to amounts which may be deducted for postretirement medical benefits. In general, deductible amounts are to be determined on an "actuarial basis", and are specified to be in one lump sum (or alternatively, over the remaining average lifetime) for persons who are already retired, and are specified as level amounts (or percentages) over the future working lifetimes for persons who are currently actively at work.
>
> These rules would apparently permit the full $20,446,059 to be deducted in 1986 for pensioners, and approximately $4,945,000 for currently active employees. Lesser amounts could, of course, be deducted for 1986.

Petitioner was obligated by the Plan to pay all medical, dental, accident, sickness, and long-term disability benefits offered under the plan. The VEBA Trust used its assets, including the 1986 contribution and its investment earnings, to pay such benefits (and administrative costs) to petitioner's employees and retirees as those benefits (and costs) came due (or arose) during the next 11 months of the Plan year. During the calendar year 1987, the VEBA Trust paid medical and dental benefit claims under

the plan for retirees in the amount of $2,787,000. During the Plan year, the VEBA Trust paid benefit claims, including related expenses, in the amount of $31,572,854. The VEBA Trust's balance at First Interstate on November 30, 1987, was $7,992,215. The balance on December 31, 1986, was $35,058,670.

The parties have stipulated that the addition to the account limit for CIBU's for the trust year ended November 30, 1986, if based on the safe harbor limits of section 419A(c), is $10,020,825 (plus $617,245 of related administrative costs), and if not based on the safe harbor limits, is $7,619,925 (plus $395,683 of related administrative costs). The parties also stipulated an increase, pursuant to section 419A(f)(7), in the amount of $432,010.

Petitioner's 1987 VEBA Trust Contribution

Pursuant to an amendment to the VEBA Trust agreement on December 29, 1987, employee welfare benefits for collectively bargained employees ceased to be funded through the VEBA Trust and were thereafter funded through a separate VEBA trust for collectively bargained employees. On December 29, 1987, petitioner contributed $12,400,000 to the VEBA Trust and $37,700,000 to the VEBA trust for the collectively bargained employees. The amounts contributed to the VEBA trust for the collectively bargained employees are not in issue in the instant case.

Petitioner calculated the amount of the 1987 contribution based on an actuarial valuation by Wyatt. Wyatt ascertained, as of November 30, 1987, that the maximum deductible combined contribution for 1987 for postretirement medical benefits was $22,476,975. Of that amount, $13,243,405 was attributable to employees and retirees not covered by collectively bargained agreements. In its report dated December 9, 1987, Wyatt stated:

> The maximum tax deductible contribution for 1987 is equal to $22,476,975 plus the any [sic] contributions for postretirement medical paid but not previously deducted. This subtotal must further be reduced by any assets attributable to the postretirement medical plan remaining in the trust at the end of the plan year.

Wyatt offered no explanation as to why the associated administration expenses were not included.

The lump-sum present values, as of December 1, 1987, of future retiree medical benefits for current pensioners and for current active employees not covered by a collectively bargained agreement, were $10,732,153 and $23,766,492, respectively.

Pursuant to the VEBA Trust agreement, the VEBA Trust's assets, including the December 29, 1987, contribution, additional contributions made during 1988, and the trust's investment earnings, were used to pay the cost of providing welfare benefits under the Plan to petitioner's employees and retirees as those benefits (and costs) arose during the VEBA Trust's 1988 year. The VEBA Trust's balance on November 30, 1988, was $1,525,484. During the 1988 calendar year, the VEBA Trust paid benefit claims

plus related expenses in the amount of $26,902,481, and medical and dental benefit claims under the Plan for retirees in the amount of $4,092,000.

Post-1987 Facts and Circumstances

Petitioner ceased prefunding the VEBA Trust after the December 1987 contribution when, sometime during October 1988, the VEBA Trust assets were depleted. After that time, petitioner funded the VEBA Trust as the benefit claims were incurred. Because petitioner was no longer prefunding the VEBA Trust, during May 1990 it changed its VEBA Trust yearend from November 30 back to a calendar yearend.

Petitioner did not disclose in its financial reports that it funded a reserve for the provision of postretirement medical benefits. The only reference to the VEBA Trust in petitioner's financial reports was to the fact that petitioner received a deferred tax benefit as a result of prefunding its group health insurance trust.[3]

During 1988, for retirees and disabled employees, and during 1990, for active employees, petitioner began disclosing to such employees the existence of the VEBA Trust. No disclosure was ever made to retirees, employees, or collective bargaining units

---

[3]    For example, petitioner's 1986 annual report indicates that $12,420,000 of Federal income taxes (46 percent of petitioner's $27 million contribution) was deferred by prefunding the company's group health insurance trust, and the deferral of the tax effect of prefunding in 1985 in the amount of $13,648,000 was reversed.

representing its employees that petitioner prefunded a reserve within the VEBA Trust to accumulate assets for PRMB's for employees.

Petitioner engaged the accounting firm of Touche Ross & Co. (Touche Ross) to audit[4] the VEBA Trust's financial statements as of December 31, 1986, and November 30, 1987. Petitioner informed Touche Ross of the liabilities of the VEBA Trust. Although petitioner did disclose to Touche Ross that there existed liabilities for unrevealed claims for medical, dental, short- and long-term disabilities, and associated administrative costs, petitioner did not disclose any "liabilities" of the VEBA Trust for PRMB's and did not disclose that any portion of the contributions made was for the purpose of funding a reserve. Consequently, the VEBA Trust's financial statements disclose neither a reserve nor a liability for a reserve for PRMB's.

Financial Accounting Standards Board (FASB) Statement No. 81, entitled "Disclosure of Post Retirement Health Care and Life Insurance Benefits" (FASB 81), was in effect during petitioner's 1986 year. FASB section 81.06 provides that employers, at a minimum, must disclose (1) a description of the benefits provided and the employee groups covered; (2) a description of the accounting and funding policies followed for those benefits; and

---

[4] Touche Ross's audit was limited, and it did not express an opinion as to certain elements of the financial statements. Those areas are not relevant to the instant case.

(3) the cost of those benefits recognized in the period. FASB 81 offers examples of appropriate disclosure statements. When benefits are annually funded based on estimated accruals, a proper disclosure could state: "The estimated cost of such benefits is accrued over the working lives of those employees expected to qualify for such benefits as a level percentage of their payroll costs". Alternatively, when benefit costs are expensed as paid, a proper disclosure could state: "The cost of retiree health care and life insurance benefits is recognized as an expense as claims are paid". Petitioner's disclosure for retiree health and life insurance benefits for its 1986 year stated: "The cost of retiree health coverage is recognized as an expense when claims are paid. The cost of life insurance benefits is recognized as an expense as premiums are paid."

The parties have stipulated that the addition to the account limit for incurred but unpaid claims for the VEBA Trust's year ended November 30, 1987, if based on the safe harbor limits of section 419A(c)(5), is $11,193,974 (plus $731,907 of related administrative costs), and if not based on the safe harbor limits, is $5,290,729 (plus $261,232 of related administrative costs).

## Discussion

Summary judgment may be granted if the pleadings and other materials demonstrate that no genuine issue exists as to any of the material facts and that a decision may be rendered as a

matter of law.  Rule 121(b); <u>Sundstrand Corp. v. Commissioner</u>, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994); <u>Colestock v. Commissioner</u>, 102 T.C. 380, 381 (1994).  In the instant case, each party has moved for partial summary judgment. Neither party argues that there is any material issue of fact remaining if we decide the three issues in the manner in which we do.

<u>Legal Framework</u>

In sections 419 and 419A, enacted as part of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, 98 Stat. 494, Congress limited the deductibility of contributions to welfare benefit funds (WBF's) in order to restrict an employer from taking a current deduction for welfare benefits to be provided in the future.  Section 419 provides, in relevant part, the following:

SEC. 419. TREATMENT OF FUNDED WELFARE BENEFIT PLANS.

(a)  General Rule.--Contributions paid or accrued by an employer to a welfare benefit fund--

(1)  shall not be deductible under this chapter, but

(2)  if they would otherwise be deductible, shall (subject to the limitation of subsection (b)) be deductible under this section for the taxable year in which paid.

(b)  Limitation.--The amount of the deduction allowable under subsection (a)(2) for any taxable year shall not exceed the welfare benefit fund's qualified cost for the taxable year.

(c)  Qualified Cost.--For purposes of this section--

(1)  In general.--Except as otherwise provided in this subsection, the term "qualified cost" means, with respect to any taxable year, the sum of--

(A) the qualified direct cost for such taxable year, and

(B) subject to the limitation of section 419A(b), any addition to a qualified asset account for the taxable year.

(2)  Reduction for funds after-tax income.--In the case of any welfare benefit fund, the qualified cost for any taxable year shall be reduced by such fund's after-tax income for such taxable year.

(3)  Qualified direct cost.--

(A)  In general.--The term "qualified direct cost" means, with respect to any taxable year, the aggregate amount (including administrative expenses) which would have been allowable as a deduction to the employer with respect to the benefits provided during the taxable year, if--

(i)  such benefits were provided directly by the employer, and

(ii) the employer used the cash receipts and disbursements method of accounting.

(B)  Time when benefits provided.--For purposes of subparagraph (A), a benefit shall be treated as provided when such benefit would be includible in the gross income of the employee if provided directly by the employer (or would be so includible but for any provision of this chapter excluding such benefit from gross income).

*     *     *     *     *     *     *

(d)  Carryover of Excess Contributions.--If--

(1)  the amount of the contributions paid (or deemed paid under this subsection) by the employer during any taxable year to a welfare benefit fund, exceeds

(2)  the limitation of subsection (b),

such excess shall be treated as an amount paid by the employer to such fund during the succeeding taxable year.

Section 419 provides that an employer's deduction for contributions to a WBF, including a VEBA, during a taxable year may not exceed the fund's "qualified cost" for the taxable year.

The qualified cost is the sum of qualified direct cost (QDC) and any additions to a qualified asset account (QAA), subject to the limitations of section 419A(b), less after-tax income for the year. Sec. 419(c). The QDC is the aggregate amount, including administrative expenses, which would have been allowable as a deduction to the employer with respect to the benefits provided during the tax year if the employer had provided those benefits directly rather than through the funds and used the cash receipts and disbursements method of accounting. Sec. 419(c)(3)(A). Such benefits are deemed provided at the time they would have been includable in the gross income of the employees if provided directly by the employer (disregarding any provision which would otherwise exclude such benefits from gross income). Sec. 419(c)(3)(B). If a contribution exceeds the year's qualified cost, the excess is treated as a contribution by the employer to the fund during the succeeding taxable year. Sec. 419(d). Pursuant to the foregoing framework, a deduction is available only for contributions made during the taxable year for benefits actually provided during the taxable year (with the exception of additions made to QAA's for CIBU's and PRMB's). Accordingly,

employers are prohibited from prefunding benefits expected to be provided in later years (other than additions made to QAA's). Stated another way, after the enactment of DEFRA, employers are no longer allowed to accelerate deductions into one taxable year for employee welfare benefits to be provided in later taxable years, except as provided in sections 419(c)(1)(B) and 419A.

Section 419A provides, in relevant part:

SEC. 419A.  QUALIFIED ASSET ACCOUNT; LIMITATION ON ADDITIONS TO ACCOUNT.

(a)  General Rule.--For purposes of this subpart and section 512, the term "qualified asset account" means any account consisting of assets set aside to provide for the payment of--

(1)  disability benefits,

(2)  medical benefits,

(3)  SUB or severance pay benefits, or

(4)  life insurance benefits.

(b)  Limitation on Additions to Account.--No addition to any qualified asset account may be taken into account under section 419(c)(1)(B) to the extent such addition results in the amount in such account exceeding the account limit.

(c)  Account Limit.--For purposes of this section--

(1)  In general.--Except as otherwise provided in this subsection, the account limit for any qualified asset account for any taxable year is the amount reasonably and actuarially necessary to fund--

(A)  claims incurred but unpaid (as of the close of such taxable year) for benefits referred to in subsection (a), and

(B)  administrative costs with respect to such claims.

(2)  Additional reserve for post-retirement medical and life insurance benefits.--The account limit for any taxable year may include a reserve funded over the working lives of the covered employees and actuarially determined on a level basis (using assumptions that are reasonable in the aggregate) as necessary for--

     (A)  post-retirement medical benefits to be provided to covered employees (determined on the basis of current medical costs), or

     (B)  post-retirement life insurance benefits to be provided to covered employees.

     *     *     *     *     *     *     *

(5)  Special limitation where no actuarial certification.--

     (A)  In general.--Unless there is an actuarial certification of the account limit determined under this subsection for any taxable year, the account limit for such taxable year shall not exceed the sum of the safe harbor limits for such taxable year.

     (B)  Safe harbor limits.--

          (i)  Short-term disability benefits.--In the case of short-term disability benefits, the safe harbor limit for any taxable year is 17.5 percent of the qualified direct costs (other than insurance premiums) for the immediately preceding taxable year with respect to such benefits.

          (ii) Medical benefits.--In the case of medical benefits, the safe harbor limit for any taxable year is 35 percent of the qualified direct costs (other than insurance premiums) for the immediately preceding taxable year with respect to medical benefits.

     *     *     *     *     *     *     *

          (i) Regulations.--The Secretary shall prescribe such regulations as may be

appropriate to carry out the purposes of this subpart. Such regulations may provide that the plan administrator of any welfare benefit fund which is part of a plan to which more than 1 employer contributes shall submit such information to the employers contributing to the fund as may be necessary to enable the employers to comply with the provisions of this section.

A fund's QAA consists of any assets set aside to provide for the payment of (1) disability benefits, (2) medical benefits, (3) supplemental unemployment compensation benefits (SUB) or severance pay benefits, or (4) life insurance benefits. Sec. 419A(a). No addition to a QAA which causes the account balance to exceed the account limit may be considered as a portion of the qualified cost under section 419(c)(1)(B). Sec. 419A(b). The account limit for any taxable year consists of two separate elements, each of which is in issue in the instant case.

The first element of the account limit is the amount reasonably and actuarially necessary to fund CIBU's as of the close of the taxable year, as well as administrative costs related to such claims. Sec. 419A(c)(1). In the event that the CIBU's are not actuarially determined, the deduction can be no greater than certain safe harbor percentages. Sec. 419A(c)(5). The second element of the account limit is a reserve funded over the working lives of covered employees and actuarially determined on a level basis (using assumptions that are reasonable in the aggregate) as necessary for PRMB's to be provided to covered employees (determined on the basis of current medical costs) or

postretirement life insurance benefits to be provided to covered employees.  Sec. 419A(c)(2).

In the event that a taxpayer did not fund a reserve for CIBU's or postretirement medical or life insurance benefits, the account limit for that taxable year would be zero.  Any amount left in the VEBA Trust at yearend in such a case would cause a reduction in the deduction equal to that remaining balance because that amount would not qualify as QDC, for although the requirement that the contribution be made during the taxable is satisfied, such remaining funds were not used to provide welfare benefits during the taxable year.  Sec. 419(c).

Issues

The parties disagree as to whether petitioner is automatically (i.e., without having to show reasonableness) entitled to use the safe harbor limits of section 419A(c)(5)(B)(i) and (ii) (discussed infra) in computing the addition to the QAA for medical, dental, and short-term disability benefit CIBU's, and associated administrative costs. The parties also disagree as to whether petitioner's $27 million contribution, or a part of that contribution, to its VEBA Trust during 1986 funded a reserve over the working lives of the covered employees for the provision of PRMB's.  Finally, petitioner challenges the validity of section 1.419-1T, Q&A-5(b)(1), Temporary Income Tax Regs., 51 Fed. Reg. 4324 (Feb. 4,

1986), on the ground that it contradicts the plain language of section 419.

A.    Claims Incurred But Unpaid

Section 419A(c)(5)(A) provides that, without an actuarial certification with respect to an account limit determined under section 419A(c), the account limit may not exceed certain "safe harbor" limits for the taxable year.  In the case of short-term disability benefits, the safe harbor limit for any taxable year is 17.5 percent of the QDC (other than insurance premiums) for the immediately preceding taxable year with respect to such benefits.  Sec. 419A(c)(5)(B)(i).  In the case of medical benefits, the safe harbor limit for any taxable year is 35 percent of the QDC (other than insurance premiums) incurred for such benefits in the prior taxable year.  Sec. 419A(c)(5)(B)(ii). The safe harbor limits are not automatic safe harbors because a taxpayer will not be entitled to use such limits unless they are reasonable, as required by section 419A(c)(1).  General Signal Corp. & Subs. v. Commissioner, 103 T.C. 216, 232 (1994).  If a taxpayer obtains an actuarial certification, however, it is not limited to the safe harbors.

Petitioner contends that there is no reasonableness requirement in section 419A(c)(5), and therefore it is entitled to use the safe harbor limits.  Based on those limits, the additions to the account limit attributable to medical, dental and short-term disability CIBU's are $10,020,825 (plus $617,245

of related administrative costs) for the VEBA Trust year ended November 30, 1986, and $11,193,974 (plus $731,907 of related administrative costs) for the VEBA Trust year ended November 30, 1987. The parties have stipulated that the additions to the account limit for CIBU's, if not based on the safe harbor limits, are $7,619,925 (plus $395,683 of related administrative costs) and $5,290,729 (plus $261,232 of related administrative costs) for the VEBA Trust years ended November 30, 1986 and 1987, respectively.

Petitioner contends that the phrase in section 419A(c)(1) "Except as otherwise provided in this subsection" means that any other provision, i.e., section 419A(c)(5), is outside of, and not subject to, the general requirement of section 419A(c)(1). Accordingly, petitioner contends that, because section 419A(c)(5) does not require that the account limit be reasonable, no such requirement exists. Petitioner also argues that the safe harbor limits allow taxpayers to avoid the burden of demonstrating that additions to the account limit are reasonable, because the only way to show reasonableness would be to obtain an actuarial certification.

We disagree with petitioner. Although Congress sought to reduce the cost of compliance by allowing certain additions to the account limit to be made without having to incur the cost of obtaining actuarial certification, a taxpayer must still show that the additions to the account limit for CIBU's during the tax

year are reasonable.  In General Signal Corp. & Subs. v. Commissioner, supra, we found that the taxpayer's calculations were not reasonable where the estimates were not made as of the fund's yearend, the computations did not apportion administrative costs between insurance premiums and other qualified direct costs, and the calculations were made using direct costs from the wrong years.  If there were no reasonableness standard, taxpayers would automatically be entitled to the safe harbor limits.  The legislative history, however, states that "Even if the safe harbors are satisfied, the taxpayer is to show that the reserves, as allowed under the general standards provided by the bill (e.g., claims incurred by unpaid) are reasonable."  General Signal Corp. & Subs. v. Commissioner, supra at 232 (quoting H. Conf. Rept. 98-861, at 1158 (1984), 1984-3 C.B. (Vol. 2) 1, 412).

In General Signal, we addressed and rejected much of the argument petitioner makes in the instant case.  Petitioner neither cites nor addresses the analysis provided in General Signal.  Our reasoning in General Signal is supported by the legislative history, and, because petitioner has neither argued that the additions to the account limit based on the safe harbors are reasonable nor offered a compelling argument to abandon the General Signal reasoning in the instant case, we will not do so.  Consequently, we grant respondent's motion for partial summary judgment with regard to the CIBU's, and deny petitioner's motion for partial summary judgment with regard thereto.  In so doing,

we conclude that petitioner is entitled to an increase in the account limit attributable to medical, dental and short-term disability CIBU's in the amounts of $7,619,925 (plus $395,683 of related administrative costs) and $5,290,729 (plus $261,232 of related administrative costs) for the VEBA Trust years ended 1986 and 1987, respectively.

B. Reserve for Postretirement Medical Benefits

Petitioner argues that the phrase "reserve funded over the working lives of the covered employees" in section 419A(c)(2) describes a method of measuring a liability to provide PRMB's and does not require a separate accumulation of assets. The issue of whether an actual reserve must be created has been addressed by this Court in General Signal Corp. & Subs. v. Commissioner, supra, and Parker-Hannifin Corp. v. Commissioner, T.C. Memo. 1996-337. In those cases, we held that the phrase "reserve funded over the working lives of covered employees" requires an accumulation of assets equal to the deduction taken, and that those assets must be used to pay retiree welfare benefit expenses. In General Signal, we stated that

> the plain language of section 419A(c)(2) suggests that Congress intended to allow the accumulation of funds over the working lives of employees for the purpose of providing postretirement benefits. This interpretation is supported by repeated references in the legislative history to the accumulation of reserves for purposes of funding postretirement benefits and by the reference to revenue rulings which dealt with reserves used to accumulate funds for postretirement benefits. Additionally, the legislative history also establishes that Congress intended "to prevent employers from

taking premature deductions, for expenses which have not yet been incurred".  * * *  [General Signal Corp. & Subs. v. Commissioner, supra at 243-244; emphasis added.]

In both General Signal and Parker-Hannifin Corp., we found that no reserve had been created, obviating the need to consider whether the contributions were excessive from an actuarial standpoint.

In General Signal, we stated that the phrase "reserve funded", on its face, "suggests that Congress intended this provision to allow the accumulation of funds by a welfare benefit fund for the purpose of providing postretirement benefits." General Signal Corp. & Subs. v. Commissioner, 103 T.C. at 239. Where a statute is ambiguous we may look to its legislative history and to the reason for its enactment.  United States v. American Trucking Associations, 310 U.S. 534, 543-544 (1940); U.S. Padding Corp. v. Commissioner, 88 T.C. 177, 184 (1987), affd. 865 F.2d 750 (6th Cir. 1989).  In General Signal, in light of the taxpayer's assertions that the phrase "reserve funded" does not have a commonly understood meaning, we assumed arguendo that the phrase was ambiguous and considered the legislative history.  General Signal Corp. & Subs. v. Commissioner, supra at 240.

The relevant portion of the committee report states:

Prefunding of life insurance, death benefits, or medical benefits for retirees.--The qualified asset account limits allow amounts reasonably necessary to accumulate reserves under a welfare benefit plan so that the medical

benefit or life insurance (including death benefit) <u>payable to a retired employee during retirement is fully funded upon retirement</u>. * * * The conferees intend that the Treasury Department prescribe rules requiring that the funding of retiree benefits be based on reasonable and consistently applied actuarial cost methods * * * [H. Conf. Rept. 98-861, at 1157 (1984), 1984-3 C.B. (Vol. 2) 1, 411; emphasis added.]

In <u>General Signal</u>, we concluded that Congress' intent was to allow for the accumulation of assets to fund certain postretirement benefits. In the instant case, petitioner has offered no arguments, beyond those made and rejected in <u>General Signal Corp. & Subs. v. Commissioner</u>, <u>supra</u>, and <u>Parker-Hannifin Corp. v. Commissioner</u>, <u>supra</u>, as to whether the language of section 419A requires an accumulation of funds in order to create a reserve. Consequently, we hold that such an accumulation of funds is necessary. Accordingly, we next consider whether such an accumulation was made.

We consider all of the facts and circumstances in deciding whether a reserve funded over the working lives of covered employees for postretirement welfare benefits was created. <u>General Signal Corp. & Subs. v. Commissioner</u>, <u>supra</u>; <u>Parker-Hannifin Corp. v. Commissioner</u>, <u>supra</u>.

In <u>General Signal</u>, the taxpayer established its VEBA Trust to prefund benefit payments it expected to incur in the calendar year following the year during which the contribution was made. For contributions to a VEBA made after December 31, 1985, the employer's deduction was limited to the employer's qualified

direct cost for the year, plus any contributions to a QAA reasonably necessary to fund CIBU's and/or to provide a reserve for postretirement medical or life insurance benefits.  Secs. 419 and 419A.  The taxpayer in General Signal increased its VEBA contributions during 1986 by making additions to a QAA, although it did not intend the VEBA trust to establish a reserve for postretirement benefits or accumulate assets for purposes of funding a reserve.  The taxpayer's additional QAA contributions during 1986 and 1987 totaled $63,300,000.  The VEBA trust's balance increased by only $8,782,003 between November 30, 1986, and November 30, 1988, while its financial statements showed expenses for retiree liabilities of only $8,813,000.  Accordingly, of the $63,300,000 contributed to fund a reserve, at least $45,700,000 ($63,300,000 less $8,782,003 and $8,813,000) was used to pay active employee welfare benefits during 1987 and 1988.  Additionally, the taxpayer made no disclosures on its financial reports of the establishment or maintenance of reserves for postretirement medical or life insurance benefits, nor did it make any disclosure to its employees or their unions of the establishment or maintenance of such reserves.  Finally, the taxpayer's Form 1024, containing projected yearend balances for 1986 through 1988, did not show reserves established for any purpose.  On the basis of all of the facts and circumstances, we concluded that the VEBA trust did not accumulate assets for the

purpose of funding a reserve for postretirement medical and life insurance benefits.

In Parker-Hannifin Corp. v. Commissioner, supra, the taxpayer argued that during its 1987 tax year it contributed $26,913,158 for postretirement employee welfare benefits. The taxpayer neither disclosed any assets set aside for postretirement welfare benefits in its 1987 financial statements, nor informed its employees of the existence or maintenance of such assets. An internal document indicated that the 1987 contribution was expected to be depleted by benefit payments over the 12 to 18 months following the creation of the VEBA Trust, and, in fact, the contribution was depleted by the second month of the taxpayer's 1989 year. During its 1988 year, petitioner made no contributions to the VEBA trust, and in the following years, only monthly contributions which approximated the monthly welfare benefits paid were made to the trust. The ending balance in the VEBA trust for each of the years 1989 and 1990 was zero. The taxpayer's Form 1024, Application for Recognition of Exemption, did not disclose the existence of a reserve. Although such a disclosure was not required by the Code or the regulations, the taxpayer's lack of disclosure, together with other evidence, indicated that reserves did not exist. We concluded that the taxpayer did not accumulate assets in the VEBA trust for the purposes of establishing a reserve for the payment of retiree welfare benefits.

In the instant case, respondent's position, simply stated, is that, considering all of the evidence, petitioner did not create a reserve.

The VEBA Trust was created by petitioner during 1982. One of its purposes was to accelerate the company's deduction for CIBU's. During 1985, petitioner recognized that statutory amendments made by DEFRA, which did not become effective until January 1, 1986, would tighten the limitations governing the deduction of contributions to VEBA trusts. An internal memorandum dated December 17, 1985, indicates that petitioner believed that prefunding the VEBA Trust would allow an acceleration of $36,500,000 of 1986 expenses into 1985, producing, assuming continued contributions to the trust, a permanent deferral of taxes. The memorandum also notes that if tax reform legislation produced a corporate tax decrease, prefunding would produce additional tax benefits. Petitioner funded the VEBA Trust with contributions totaling $37,600,000 during December 1985. That contribution was the only contribution made to the VEBA Trust during its year ending November 30, 1986. The VEBA Trust's beginning balance on December 1, 1985, of $1,835,475, its investment income of $360,578, and the December contributions were used to pay medical, dental, accident, sickness, and long-term disability benefits under the plan as they were incurred during the year, leaving a yearend balance of $11,297,108 on November 30, 1986.

As discussed infra, section 1.419-1T, Q&A-5(b)(1), Temporary Income Tax Regs., 51 Fed. Reg. 4324 (Feb. 4, 1986), effectively denies the prefunding of claims by using differing taxable year ends. In an internal memorandum dated April 23, 1986, petitioner recognized that that regulation could close the "loophole created by the statute's ambiguity." During 1986, petitioner increased its section 419A account limit by allegedly creating a reserve for PRMB's under section 419A(c)(2). Wyatt, petitioner's actuary, calculated that the present value of petitioner's PRMB's, as of December 1, 1986, for retirees was $20,446,059, and for current active employees was $46,699,569, the deductible portion of which was $4,945,000. Accordingly, in Wyatt's view the total deductible cost of PRMB's for petitioner's tax year ending December 31, 1986, was $25,391,059. The associated administrative expenses were $1,650,419, which is 6.5 percent of the deductible PRMB's, and when they are added to the cost of the PRMB's, the total is $27,041,478.

On December 30, 1986, petitioner contributed $27 million to the VEBA Trust. That contribution was the only one made to the VEBA Trust during the 1986 calendar year. The balance of the VEBA Trust on December 31, 1986, was $35,058,670. During the 1987 Plan year, the VEBA Trust paid benefit claims, including related expenses, of $31,572,854. During the 1987 Plan year, only $2,787,000 was paid by the VEBA Trust for benefit claims of

retirees. The VEBA Trust's balance on November 30, 1987, was $7,992,215.

Wyatt calculated that the present value of petitioner's PRMB's, as of December 1, 1987, for retirees was $10,732,153, and for current active employees was $23,766,492, the deductible portion of which was $2,511,252, for a total deductible reserve contribution of $13,243,405.

On December 29, 1987, petitioner made a $12,400,000 contribution to the VEBA Trust. During the 1988 Plan year, the December 29, 1987, contribution, additional contributions made during 1988, and the VEBA Trust investment income were used to pay the cost of providing medical, dental, accident, sickness, and long-term disability benefits (and administrative costs) under the Plan to petitioner's employees and retirees as those benefits and costs came due during the VEBA Trust's 1988 year. During the 1988 calendar year, only $4,092,000 was actually paid by the VEBA Trust under the Plan for PRMB's. The VEBA Trust's balance on November 30, 1988, was $1,525,484.

If there had been an accumulation of assets, the balance would have reflected the reserve contributions for 1986 and 1987, less any amounts actually paid for PRMB's during 1986 and 1987. The 1986 deductible contribution amount (the amount actuarially determined as necessary to create a reserve for PRMB's) was $27,041,478. During the 1987 plan year, $2,787,000 was paid by the VEBA Trust for PRMB's. Accordingly, the beginning balance

for the 1988 plan year should have been, if properly funded, $24,254,478 ($27,041,478 less $2,787,000). The yearend balance on November 30, 1987, was in fact only $7,992,215. The deductible contribution amount for the 1988 plan year was $13,243,405.[5] During the 1988 year, $4,092,000 was paid for PRMB's. Accordingly, the increase in the required reserve at the 1988 plan yearend is $9,151,405 ($13,243,405 less $4,092,000). Consequently, the total reserve balance should be $33,405,883 at the 1988 yearend ($24,254,478 plus $9,151,405). The November 30, 1988, yearend balance of the VEBA Trust, however, was $1,525,484, which supports a conclusion that, in fact, no reserve was funded.

Petitioner claims that it continued to fund the reserve for PRMB's during 1988. Petitioner, however, ceased funding the VEBA Trust for PRMB's after the December 1987 contribution, and sometime during October 1988, the VEBA Trust's assets were depleted. If petitioner had funded a reserve for the provision of PRMB's, it would not have depleted the VEBA Trust by October 1988. What apparently caused that depletion was that all of the assets of the VEBA Trust were used to pay welfare benefit claims incurred, which is inconsistent with funding a reserve.

Although petitioner did make reference to an insurance trust on its financial statements, it gave no notice to shareholders,

---

[5] This figure represents only the deductible contribution amount for employees not covered by collectively bargained agreements.

employees, retirees or disabled employees of the existence of a reserve within the VEBA Trust for the accumulation of assets, i.e., the creation of a reserve, for the provision of postretirement medical benefits. This circumstance also supports the conclusion that petitioner did not fund or create a reserve.

Petitioner engaged the services of Touche Ross to audit its VEBA Trust financial statements, but it did not disclose to Touche Ross the existence of a reserve or liabilities for the provision of PRMB's. Petitioner, however, did disclose its reserve for CIBU's, and it was reported on the VEBA Trust's financial statements.

Although FASB 81 requires disclosure of the funding policies followed for providing benefits and sets out an example of how a company could disclose the fact that it funded benefits on the basis of an accrual over the working lives of the covered employees, the funding method for the cost of retiree health coverage that petitioner actually disclosed was that claims would be expensed as they were incurred. This circumstance is additional support for the conclusion that petitioner did not fund a reserve for the provision of PRMB's.

In an attempt to distinguish General Signal Corp. & Subs. v. Commissioner, 103 T.C. 216 (1994), and Parker-Hannifin Corp. v. Commissioner, T.C. Memo. 1996-337, from the instant case, petitioner points out that it established the VEBA Trust in 1982 and used it at all times thereafter to pay employee welfare

benefits, whereas petitioner asserts that in General Signal and
Parker-Hannifin Corp. the VEBA's were short-lived tools utilized
primarily as a mechanism for accelerating expenses prior to the
corporate tax rate reduction.  Although it may be true that
petitioner's VEBA Trust has been used to provide employee welfare
benefits since 1982, our inquiry is not whether the VEBA Trust
was used improperly for tax avoidance purposes.  Rather, the
question is whether petitioner created a reserve for PRMB's
funded over the working lives of its covered employees.  Such
reserves were not provided for by the Code for tax years ending
prior to December 31, 1985.  Petitioner increased its account
limit for a reserve contribution in 1986 and 1987 but then ceased
such funding.  Because we must decide whether a reserve was in
fact created, it is irrelevant how long petitioner utilized a
VEBA Trust, or that it still has its VEBA Trust.

For the foregoing reasons, we hold that no reserve was
created.

C.  Section 1.419-1T, Q&A-5(b)(1), Temporary Income Tax
    Regs.

The parties, on brief, agree that under section 419 a
contribution to a VEBA Trust is not deductible unless it
satisfies the following two conditions (among others).  First,
the contribution is deductible only to the extent it is paid to
the fund during the taxable year.  Sec. 419(a)(2).  The parties
agree that $28,937,701 was paid or deemed paid to the fund during

1986.[6]  Second, the amount of the deduction shall not exceed the fund's qualified cost for the fund's taxable year.  Sec. 419(b); sec. 1.419-1T, Q&A-4, Temporary Income Tax Regs., 51 Fed. Reg. 4324 (Feb. 4, 1986).  As discussed supra, the qualified cost is the qualified direct cost, $29,651,067, plus any additions to a QAA, $8,447,418,[7] less the fund's after-tax income for the year, $1,512,700, which in the instant case yields $36,585,785.  Sec. 419(c).  The third limitation, contained in section 1.419-1T, Q&A-5(b)(1), Temporary Income Tax Regs., 51 Fed. Reg. 4324 (Feb. 4, 1986), causes contributions made after the close of a fund's taxable year, but during the taxpayer's taxable year, to be included in the fund's yearend balance.  The dispute of the parties is whether the regulation is valid.

1.  Mechanics of the Regulation

Section 1.419-1T, Q&A-5(b)(1), Temporary Income Tax Regs., supra, provides:

> (b)(1) Pursuant to section 419A(i), notwithstanding section 419 and § 1.419-1T, contributions to a welfare benefit fund during any taxable year of the employer beginning after December 31, 1985, shall not be deductible for such taxable year to the extent that such contributions result in the total amount in the

---

[6]    This amount comprises the Dec. 30, 1986, contribution of $27 million and the $1,937,701 disallowed in 1985 and deemed to have been contributed on Jan. 1, 1986.

[7]    The $8,447,418 addition to the QAA comprises CIBU's of $7,619,725, associated administrative costs of $395,683, and an increase pursuant to sec. 419A(f)(7) of $432,010.

fund as of the end of the last taxable year of the fund ending with or within such taxable year of the employer exceeding the account limit applicable to such taxable year of the fund (as adjusted under section 419A(f)(7)). Solely for purposes of this subparagraph, (i) contributions paid to a welfare benefit fund during the taxable year of the employer but after the end of the last taxable year of the fund that relates to such taxable year of the employer, and (ii) contributions accrued with respect to a welfare benefit fund during the taxable year of the employer or during any prior taxable year of the employer (but not actually paid to such fund on or before the end of a taxable year of the employer) and deducted by the employer for such or any prior taxable year of the employer, shall be treated as an amount in the fund as of the end of the last taxable year of the fund that relates to the taxable year of the employer. Contributions that are not deductible under this subparagraph are in excess of the qualified cost of the welfare benefit fund for the taxable year of the fund that relates to the taxable year of the employer and thus are treated as contributed to the fund on the first day of the employer's next taxable year.

The first sentence of the foregoing regulation reiterates the rule established by sections 419 and 419A, and General Signal Corp. & Subs. v. Commissioner, supra, providing that contributions to a WBF which cause the amount in the VEBA Trust to be greater than the account limit during a tax year will cause a reduction in the deductible amount of any contribution made during the year. The second sentence eliminates the tax benefit to be obtained by having the taxable year of a WBF end prior to the taxable yearend of a taxpayer. That sentence causes any contribution or portion thereof made to a WBF after the fund's yearend, but prior to the taxpayer's yearend (intrayearend

contributions), to be "treated as an amount in" the WBF as of the end of the WBF's taxable year.[8]

In the instant case, the second sentence of the regulation would prevent petitioner's deduction on the basis of the following calculation. The fund balance on November 30, 1986, was $11,297,108. Petitioner contributed $27 million to the VEBA Trust during December 1986, which under the regulation is deemed part of the November 30, 1986, yearend balance, equal to $38,297,108. As was mentioned supra, any balance remaining in the VEBA Trust which is greater than the QAA account limit is not allowed as a deduction. Sec. 419A(b). The deemed yearend balance on November 30, 1986 ($38,297,108), less the QAA account limit ($8,447,418) equals the amount of the actual contribution which is not allowable ($29,849,690) as a current deduction. Because the disallowed amount ($29,849,690) is greater than the actual contribution for the year ($27 million), there is no amount of the 1986 contribution which is allowable as a current deduction. Consequently, the deductible amount for 1986, pursuant to section 1.419-1T, Q&A-5(b)(1), Temporary Income Tax Regs., supra, is zero.

Petitioner contends that the limitation in the regulation is not supported by sections 419 and 419A and, therefore, is an

---

[8] See also sec. 1.419-1T, Q&A-4, Temporary Income Tax Regs., 51 Fed. Reg. 4324 (Feb. 4, 1986), which similarly defines the taxable year where the employer and the fund have a different yearend.

impermissible broadening of the statute.  Petitioner changed the tax year of the VEBA Trust from a calendar yearend to a fiscal year ending November 30 during November of 1985.  Changing the yearend of the VEBA Trust was an attempt to avoid the limit on additions to a qualified asset account as imposed by section 419A.  By making a full contribution during December for the next year's claims, petitioner sought to take a deduction for the year of the contribution while treating the contribution as being made in the following year of the VEBA Trust and avoiding the account limit imposed by sections 419 and 419A.  Petitioner argues that, but for the regulation, its intrayearend contribution, made during December 1986, would be deductible in 1986, because that contribution would not be required to be included as part of the VEBA as of its taxable year ending November 30, 1986.  Accordingly, petitioner argues, the regulation contradicts the plain language of section 419 and is invalid.  Petitioner contends that it is therefore entitled to a deduction for the 1986 contribution without application of the limitation.

2.  <u>Review of the Regulation</u>

In <u>General Signal Corp. & Subs. v. Commissioner</u>, <u>supra</u>, where the facts were virtually identical to the facts in this case, the taxpayer did not argue that section 1.419-1T, Q&A-5(b)(1), Temporary Income Tax Regs., <u>supra</u>, was invalid, so we left that question for another day.  <u>Id.</u> at 238.  Accordingly, we

are now called upon to answer the question of the validity of the regulation.

Generally, temporary regulations are accorded the same weight as final regulations. Redlark v. Commissioner, 106 T.C. 31, 38 (1996); Peterson Marital Trust v. Commissioner, 102 T.C. 790, 797 (1994), affd. 78 F.3d 795 (2d Cir. 1996). Section 419A(i) provides that the regulations shall be promulgated by the Secretary as may be necessary to carry out the purposes of sections 419 and 419A.[9]

If the intent of Congress on a matter is clear, then the Secretary must give effect to the unambiguously expressed intent of Congress. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1983). If, however, the statute is silent or ambiguous with respect to the specific issue, a court must let stand any permissible construction of the statute by the agency, unless the construction is arbitrary, capricious, or manifestly contrary to the statute. Id. at 843. If the administrator's regulation fills a gap or defines a term in a way that is reasonable in light of congressional intent, the regulation should be given controlling weight. NationsBank v. Variable Annuity Life Ins. Co., 513 U.S. 251, 257 (1995); Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., supra at

---

[9] Based on our analysis infra, we find it unnecessary to decide whether the regulations are interpretive or legislative.

843; <u>Bell Fed. Sav. & Loan Association v. Commissioner</u>, 40 F.3d 224 (7th Cir. 1994), revg. T.C. Memo. 1991-368.

### 3. Legislative Intent

Sections 419 and 419(A) were enacted as part of DEFRA, which made these sections effective for contributions paid or accrued after December 31, 1985, in taxable years ending after December 31, 1985.  Speaking to the special grant of regulatory authority in section 419(e)(3)(C), with respect to the definition of "fund", the conference committee report states:

> In prescribing regulations relating to the definition of the term "fund," the conferees wish to emphasize that <u>the principal purpose of this provision of the bill is to prevent employers from taking premature deductions, for expenses which have not yet been incurred</u>, by interposing an intermediary organization which holds assets which are used to provide benefits to the employees of the employer.  * * * [H. Conf. Rept. 98-861, at 1155 (1984), 1984-3 C.B. (Vol. 2) 1, 409; emphasis added.]

Although the foregoing portion of the legislative history specifically deals with section 419(e), it demonstrates that Congress was primarily concerned with preventing employers from accelerating deductions prior to their being incurred.  <u>General Signal Corp. & Subs. v. Commissioner</u>, 103 T.C. at 243.  As stated above, prior to the enactment of DEFRA, an employer generally could deduct a contribution to a WBF in the year it was made or accrued even though the corresponding benefits were not includable in the income of the recipient until a later year.  H. Conf. Rept. 98-861, <u>supra</u> at 1154, 1984-3 C.B. (Vol. 2) at 408;

see also <u>Moser v. Commissioner</u>, T.C. Memo. 1989-142 (allowing a deduction for a single contribution to a VEBA which funded all of the welfare benefits the VEBA was expected to pay), affd. on other grounds 914 F.2d 1040 (8th Cir. 1990).

Both sections 419 and 419A, in their attempt to end the acceleration of deductions for contributions to VEBA's, refer to the taxable year, or taxable yearend.  These sections, by their terms, do not deal specifically with a situation where the trust and the employer use different taxable years, creating a gap in the statutes.  The regulation fills the gap by treating contributions to a VEBA after the VEBA yearend but prior to the taxpayer's yearend as being in the fund at the time of the VEBA yearend.[10]

Because the regulation is consistent with the intent of DEFRA, and because it permissibly fills a gap created by sections 419 and 419A, we conclude that section 1.419-1T, Q&A-5(b)(1), Temporary Income Tax Regs., 51 Fed. Reg. 4324 (Feb. 4, 1986), is not impermissibly broader than sections 419 and 419A  and, accordingly, we hold that it is valid.  <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, <u>supra</u>.  We have

---

[10]  Respondent also argues that the deduction limited by the regulation would not otherwise be allowable, as required by sec. 419(a)(2), i.e., under secs. 162, 446, 461, and 7852, and that therefore the regulation is valid.  Because we hold that the regulation is valid on other grounds, we do not address this argument.

considered the remaining arguments of the parties and find them either without merit or unnecessary to reach.

To reflect the foregoing,

<u>An appropriate order</u>

<u>will be issued.</u>